CITY OF WARRENSVILLE HEIGHTS, APPELLANT, *v.*
JENNINGS ET AL., APPELLEES.

[Cite as Warrensville Hts. *v.* Jennings (1991), 58 Ohio St. 3d 206.]

(No. 89-2096—Submitted November 28, 1990—Decided April 3, 1991.)

*Steiner & Stern, Howard S. Stern,* acting law director, *Mandanici & Cirincione* and *Ross S. Cirincione,* for appellant.

*Lee I. Fisher,* attorney general, and *Betsey Nims Friedman,* for appellee Administrator, Bureau of Employment Services.

MOYER, C.J. On an appeal from the Unemployment Compensation Board of Review, a common pleas court must affirm the decision of the board unless it is "unlawful, unreasonable, or against the manifest weight of the evidence * * *." R.C. 4141.28(O). We hold that the common pleas court abused its discretion in affirming the board's order. Jennings was discharged for "just cause" and he is therefore disqualified from receiving unemployment compensation.

R.C. 4141.29(D)(2)(a) generally precludes an award of unemployment compensation benefits for a person who has "quit his work without just cause or has been discharged for just cause in connection with his work * * *." This court has expressed its agreement with the definition of "just cause" as " 'that which, to an ordinarily intelligent person, is a justifiable reason for doing or not doing a particular act.' " *Irvine* v. *Unemployment Comp. Bd. of Review* (1985), 19 Ohio St. 3d 15, 17, 19 OBR 12, 14, 482 N.E. 2d 587, 589, quoting *Peyton* v. *Sun T.V.* (1975), 44 Ohio App. 2d 10, 12, 73 O.O. 2d 8, 9, 335 N.E. 2d 751, 752. Necessarily, however, " 'each case must be considered upon its particular merits.' " *Id.*

In the case of a police officer, an interpretation of "just cause" must consider the particular needs of police departments. In *Jones* v. *Franklin Cty. Sheriff* (1990), 52 Ohio St. 3d 40, 43, 555 N.E. 2d 940, 944, we quoted approvingly the common pleas court's statement " 'that police officers are held to a higher standard of conduct than the general public.' " We further stated, "Law enforcement officials carry upon their shoulders the cloak of authority of the state. For them to command the respect of the public, it is necessary then for these officers even when off duty to comport themselves in a manner that brings credit, not disrespect, upon their department." *Id.* "[I]t is incumbent upon a police officer to keep his or her activities above suspicion both on and off duty." *Id.* at 44, 555 N.E. 2d at 945. Because a higher standard of conduct applies to police officers, just cause may exist regarding those officers even though it would not exist regarding another employee.

In this context, we find that Jennings's refusal to obey Merchant's or-

der to take the polygraph test constitutes "just cause" for his discharge. Initially, we note that Jennings's refusal to obey a superior's order would usually constitute just cause for removal.

The administrator, however, argues that Jennings's insubordination should be treated differently because it involved a refusal to take a polygraph test. The administrator contends that, absent a pre-employment contractual agreement by the employee or an employer rule, the refusal of the employee to take an employer-ordered polygraph test is insufficient cause to justify the denial of unemployment compensation benefits. See *Valley Vendors, Inc.* v. *Jamieson* (Ariz. App. 1981), 129 Ariz. 238, 630 P. 2d 61. Some courts have upheld the denial of benefits because of the breach by the employee of his pre-employment contractual agreement to take a polygraph test. See *Swolsky Enterprises* v. *Halterman* (1983), 12 Ohio App. 3d 23, 12 OBR 109, 465 N.E. 2d 894; *Vaughan* v. *Shop & Go, Inc.* (Fla. App. 1987), 526 So. 2d 91.

We are not persuaded that an agreement or rule should be a necessary predicate to a police department's order for a polygraph test. In suggesting the need for an agreement, the court in *Valley Vendors, supra,* emphasized the unreliability of the polygraph test. Admittedly, polygraph test results are not generally admissible in evidence absent stipulation by the parties. *Criss* v. *Springfield Twp.* (1990), 56 Ohio St. 3d 82, 85, 564 N.E. 2d 440, 443. "[T]he reliability and accuracy of polygraph examinations are open to question." *Id.* at 85, 564 N.E. 2d at 444. However, this court in *State* v. *Souel* (1978), 53 Ohio St. 2d 123, 131-132, 7 O.O. 3d 207, 211, 372 N.E. 2d 1318, 1323, accepted the view of the Arizona Supreme Court that the polygraph test had been " 'developed to a state in which its results are probative enough to warrant admissibility upon stipulation.' " *Id.,* quoting *State* v. *Valdez* (1962), 91 Ariz. 274, 283, 371 P. 2d 894, 900.

Furthermore, other courts have noted that the polygraph test can be a useful tool in internal departmental investigations of police misconduct:

" 'Effective and efficient operation of a police department requires that allegations of police misconduct be thoroughly investigated. The polygraph machine can be a useful investigative tool when the test is skillfully prepared and is administered and interpreted by a qualified person; while it is not accurate to the degree that absolute judgments can be made as to the veracity of the person tested * * * the results are often reliable within recognized limits. * * *' " (Citation omitted.) *Seattle Police Officers' Guild* v. *Seattle* (1972), 80 Wash. 2d 307, 318-319, 494 P. 2d 485, 492, quoting *Coursey* v. *Bd. of Fire & Police Commrs. of Skokie* (1967), 90 Ill. App. 2d 31, 43, 234 N.E. 2d 339, 344.

Because the polygraph test can be reliable enough for some purposes, we decline to hold that a police department lacks just cause merely because it orders an employee to take a polygraph test without having a contractual basis for such order.

Instead, we apply with one modification the rule set forth in *Eshelman* v. *Blubaum* (Ariz. App. 1977), 114 Ariz. 376, 560 P. 2d 1283. In *Eshelman,* the court upheld the dismissal of a police officer who had refused to obey a superior's order to take a polygraph test. Although *Eshelman* was a discharge case rather than an unemployment compensation case, we presume that the police officer in *Eshelman* could be discharged only for some form of misconduct, as he had been specifically charged with "wilful disobedience of an order" and "insubordination."

Despite the administrator's argument, we see no reason to distinguish such discharge cases from unemployment compensation cases, since both types of cases require some showing of "cause" to justify a police officer's dismissal.

The court in *Eshelman* first noted that there has been a split of authority concerning the validity of orders requiring police officers to submit to polygraph tests. The *Eshelman* court then stated:

"We agree with the latter cited authorities that the compulsory use of the polygraph during departmental investigations is consistent with the maintenance of a police or sheriff's department that is of the highest integrity and beyond suspicion. * * * The criteria for demanding such a test in the course of an internal investigation are that the officer must be informed (1) that the questions will relate specifically and narrowly to the performance of his official duties, (2) that the answers cannot be used against him in any subsequent criminal prosecution, and (3) that the penalty for refusing is dismissal. * * *" (Citations omitted.) *Id.* at 378-379, 560 P. 2d at 1285-1286.

In addition to these three requirements, the *Eshelman* court noted a fourth requirement later in its opinion: "[A]n officer may refuse a polygraph and not be subject to dismissal if the order is shown to have been unreasonable, arbitrary, or capricious." *Id.* at 379, 560 P. 2d at 1286.

The *Eshelman* criteria are derived in part from United States Supreme Court cases concerning the Fifth Amendment right of public employees against self-incrimination. It has been established that a public employer may discharge an employee for refusing to answer questions specifically related to the employee's performance of his or her official duties. In *Gardner* v.

*Broderick* (1968), 392 U.S. 273, 278, the court stated:

"* * * If appellant, a policeman, had refused to answer questions specifically, directly, and narrowly relating to the performance of his official duties, without being required to waive his immunity with respect to the use of his answers or the fruits thereof in a criminal prosecution of himself, *Garrity* v. *New Jersey* [(1967), 385 U.S. 493] * * *, the privilege against self-incrimination would not have been a bar to his dismissal." (Footnote omitted.)

Similarly, in *Uniformed Sanitation Men Assn., Inc.* v. *Commr. of Sanitation of New York* (1968), 392 U.S. 280, 285, the court stated: "At the same time, petitioners, being public employees, subject themselves to dismissal if they refuse to account for their performance of their public trust, after proper proceedings, which do not involve an attempt to coerce them to relinquish their constitutional rights."

In light of *Gardner* and *Sanitation Men*, we disagree with the first requirement of *Eshelman* that an officer must be informed "that the questions will relate specifically and narrowly to the performance of his official duties." Such a vague warning serves no useful purpose to an officer who wishes to know the exact topics about which he will be questioned. Instead, the purposes of *Gardner* and *Sanitation Men* are satisfied when the police officer is informed of the subject of the intended inquiry, which is specifically and narrowly related to the performance of his official duties.

We adopt the second and third requirements of the *Eshelman* test. As part of an order to a police officer to take a polygraph test, the officer should be informed that his answers cannot be used against him in any criminal proceeding and that he may

be discharged if he refuses to comply with the order. These warnings are part of the "proper proceedings" mandated by *Sanitation Men, supra. Uniformed Sanitation Men Assn., Inc.* v. *Commr. of Sanitation of New York* (C.A.2, 1970), 426 F. 2d 619, 627, certiorari denied (1972), 406 U.S. 961 (" 'After proper proceedings' means proceedings, such as those held here, in which the employee is asked only pertinent questions about the performance of his duties and is duly advised of his options and the consequences of his choice.").

Consistent with *Eshelman*, we conclude that an officer need not be told that the results of the polygraph test cannot be used in a later criminal proceeding. If the officer's answers during the test cannot be used, then necessarily the test results themselves cannot be used, those results being useless without the accompanying answers. Nor is it necessary, in our view, that the officer be told that any "fruits" derived from his answers cannot be used in a criminal prosecution. When the officer is told that his answers cannot be used in a later criminal prosecution, we believe there is an adequate implicit assurance that the fruits derived from the answers likewise cannot be used. To the extent other courts have held that an additional express warning regarding fruits is essential, see *Kalkines* v. *United States* (1973), 200 Ct. Cl. 570, 580, 473 F. 2d 1391, 1396, we decline to follow those courts.

In addition to the foregoing requirements, we hold that an order to take a polygraph test must be reasonable. In the context of a "just cause" determination, the police department's purported reason for requesting the polygraph test must be assessed. If the department has no reason or an unlawful reason for demanding the test, a refusal to take the test does not rise to the level of just cause.

Accordingly, we hold that a police officer may be dismissed for just cause within the meaning of R.C. 4141.29(D)(2)(a) when he or she refuses to obey a superior's reasonable order to take a polygraph test, so long as the officer has been informed as part of such order (1) of the subject of the intended inquiry, which is specifically and narrowly related to the performance of the officer's official duties, (2) that the officer's answers cannot be used against him or her in any subsequent criminal prosecution, and (3) that the penalty for such is dismissal.

These requirements were met in the present case. The record demonstrates that Jennings was informed that the topic of the polygraph examination would be his possible use of drugs, including the October 1986 incident. Jennings himself testified as follows:

"Q. Now do you—or would you admit that—that Chief—Chief Merchant explained to you when he asked you to take the polygraph test that if you took the test its results would not be used in any criminal (claimant interrupts)

"A. Yes, he (Mr. Cirincione interrupts)

"Q. —prosecution?

"A. —he told me this.

"Q. And that the sole purpose for administering the test or requesting the test was to discover whether or not you had an invol — been involved with any drugs in light of the fact that at the time of your hiring it was revealed that you had, on occasion, used drugs?

"A. Uh-huh.

"Q. So you understood that at that time?

"A. Yes, I understood it.

"Q. That that test was for that limited purpose?

"A.   Yes sir."

Merchant likewise testified that he told Jennings that "it was necessary that he take a polygraph test to reaffirm his position and that it was in the best interest of the public that we know for sure that he wasn't involved in this drug incident * * *." Thus, Jennings knew the subject of the intended inquiry would be his possible involvement with drugs, including the October 1986 incident.

The administrator nevertheless contends that possible off-duty drug involvement was not "specifically and narrowly related" to Jennings's performance of his "official duties." In view of our discussion in *Jones, supra*, regarding a police officer's duty to maintain a higher standard of conduct both on and off duty, we find this contention without merit. In *Jones*, we upheld the dismissal of a deputy sheriff based on her off-duty, vigilante-style conduct and her refusal to respond to questions regarding that conduct. A police officer's continuing duty to obey and enforce the criminal law, even when off duty, has been recognized in other case law and in certain statutes that impose duties on police officers without any "off-duty" exception. See *State* v. *Glover* (1976), 52 Ohio App. 2d 35, 38, 6 O.O. 3d 20, 22, 367 N.E. 2d 1202, 1204; R.C. 737.11 ("The police force of a municipal corporation shall * * * obey and enforce * * * all criminal laws of the state and the United States * * *."); R.C. 2921.44(A)(2) (A law enforcement officer is subject to criminal liability if he negligently "[f]ail[s] to prevent or halt the commission of an offense or to apprehend an offender, when it is in his power to do so alone or with available assistance.").

Although Jennings was not a patrol officer, his position as a dispatcher made him an integral member of the department's law enforcement efforts.

It could be expected that the police department would demand that he meet the same high standard of conduct as other officers. Indeed, Jennings's employment was subject to a rule of the department that expressly prohibited any member of the department from illegally taking, possessing, or using any controlled substance. This rule likewise had no off-duty exception. At a minimum, Jennings had an official duty to obey criminal laws concerning drugs even when off duty. This official duty was directly implicated by his arrest for the October 1986 incident, which raised the possibility of illegal drug use and possession by Jennings and his friends. As a result, Merchant's intended inquiry into that area was consistent with the dictates of *Gardner* and *Sanitation Men*. See *Firemen's & Policemen's Civ. Serv. Comm.* v. *Burnham* (Tex. App. 1986), 715 S.W. 2d 809, certiorari denied (1988), 488 U.S. 842; *Broderick* v. *Police Commr. of Boston* (1975), 368 Mass. 33, 39-40, 330 N.E. 2d 199, 204, certiorari denied (1976), 423 U.S. 1048 ("We decline to hold that the [police] commissioner must close his eyes to what might constitute outrageous, even illegal, conduct on the part of police officers under his command on the principle that the conduct took place when the officer was off duty.").

In addition, Jennings's possible use of drugs implicated important safety concerns. As Merchant testified, a police dispatcher is the "hub" of the police and fire departments, often coordinating the response of those departments to emergency situations. A dispatcher using drugs even while off duty immediately before going on duty could seriously undermine the public safety by misstating or misunderstanding information or otherwise failing to respond in those situations. Although Merchant could not know whether off-

duty drug use had spread to on-duty use, he could investigate as a matter of safety whether it in fact had done so. Under these circumstances, the topic of possible drug use by Jennings was specifically and narrowly related to the performance of his official duties.

The second and third of the foregoing requirements were also met. The record demonstrates that Jennings was made aware that Merchant was not "after any criminal prosecution" and that the results of the polygraph test would not be used in any criminal proceeding. Taken together, these warnings were adequate to inform Jennings that his answers during the polygraph test could not be used later in a criminal action. Likewise, Jennings was expressly informed that the penalty for refusal to take the polygraph test was dismissal.

Finally, Merchant's order to take the test was reasonable. It was based on Jennings's admitted arrest in the October 1986 incident. The circumstances of that incident reasonably caused Merchant to be apprehensive about the further employment of Jennings. Jennings had admitted to marijuana use in the past, and now the evidence pointed toward possible cocaine and marijuana possession and use. The police department could not accept the risk of employing a possible drug abuser in the police dispatcher position. Given these circumstances, Merchant had reason to investigate Jennings's conduct in the October 1986 incident and his possible drug use generally.

Accordingly, we conclude that Merchant's order to take a polygraph test was a reasonable and lawful one and that Jennings's refusal to take the test therefore constituted just cause for his dismissal. As a result, he is disqualified from receiving unemployment compensation benefits by R.C. 4141.29(D)(2)(a). The court of appeals' judgment affirming the award of such benefits to Jennings is hereby reversed.

*Judgment reversed.*

HOLMES, WRIGHT, H. BROWN and RESNICK, JJ., concur.

SWEENEY and DOUGLAS, JJ., dissent.