# FOR PUBLICATION

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

ELIZABETH AGUILERA; PHILLIP
ARELLANO; BENJAMIN BARDON;
GUSTAVO CARRILLO; HECTOR
RAMIREZ,
        *Plaintiffs-Appellants,*

        v.

LEROY BACA, individually and as
Sheriff of the County of Los
Angeles; WILLIAM STONICH,
individually and as Under Sheriff
of the Los Angeles County
Sheriff's Department; LARRY
WALDIE, individually and as
Assistant Sheriff of the Los
Angeles County Sheriff's
Department; WILLIAM MCSWEENEY,
individually and as Commander of
the Los Angeles County Sheriff's
Department; NEIL TYLER,
individually and as Commander of
the Los Angeles County Sheriff's
Department; THOMAS ANGEL,
individually and as Commander of
the Los Angeles County Sheriff's
Department; ARTHUR NG,
individually and as Captain of the
Los Angeles County Sheriff's
Department; ALAN SMITH,
individually and as Lieutenant of

No. 05-56617

D.C. No.
CV-03-06328-SVW

OPINION

16785

the Los Angeles County Sheriff's
Department; MARGARET WAGNER,
individually and as Lieutenant of
the Los Angeles County Sheriff's
Department; RUSSELL KAGY,
individually and as Sergeant of the
Los Angeles County Sheriff's
Department; BRIAN PROCTOR,
individually and as Sergeant of the
Los Angeles County Sheriff's
Department; LOS ANGELES COUNTY
SHERIFF'S DEPARTMENT; COUNTY OF
LOS ANGELES, a municipal
corporation,
              *Defendants-Appellees.*

Appeal from the United States District Court
for the Central District of California
Stephen V. Wilson, District Judge, Presiding

Argued and Submitted
July 10, 2007—Pasadena, California

Filed December 27, 2007

Before: Alex Kozinski, Chief Judge, Andrew J. Kleinfeld,
and Richard C. Tallman, Circuit Judges.

Opinion by Judge Tallman;
Dissent by Chief Judge Kozinski

COUNSEL

Elizabeth J. Gibbons, Encino, California, for the plaintiffs-appellants.

Paul B. Beach and Jin S. Choi, Glendale, California, for the defendants-appellees.

OPINION

TALLMAN, Circuit Judge:

Plaintiffs, various Los Angeles County sheriff's deputies, appeal an adverse summary judgment in favor of Sheriff Leroy Baca, the Sheriff's Department, other supervisory officers, and internal affairs investigators. The deputies allege that they were improperly detained at the East Los Angeles Sheriff's Station and later punished through involuntary shift transfers for failing to give non-privileged statements in connection with an internal criminal civil rights investigation of their possible misconduct while on uniformed patrol duty. The deputies alleged § 1983[1] violations of their own Fourth

---

[1] 42 U.S.C. § 1983 provides, in relevant part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to

Amendment right to be free from unreasonable seizures, their Fifth Amendment due process right against compelled self-incrimination, and their Fourteenth Amendment due process rights to be free from coercive police questioning and governmental conduct that shocks the conscience. We have jurisdiction under 28 U.S.C. § 1291 and affirm.

I

Shortly after 1:30 a.m. on September 5, 2002, Lieutenant Abel Moreno, the Watch Commander on duty at the East Los Angeles Sheriff's Station, learned that a citizen had been hospitalized with injuries to his head and back due to an alleged assault with a baton or flashlight without provocation by a uniformed deputy. The victim, Martin Flores, had been a bystander at the scene of a narcotics investigation when he was allegedly assaulted. The deputies were present while a search warrant was being executed by narcotics officers.

Sheriff's Department supervisors immediately initiated an internal affairs investigation into victim Flores's complaint of deputy misconduct. Sergeant Burke went to the hospital and obtained a videotaped statement from complainant Flores. Burke observed obvious physical injuries suffered by Flores. Burke then returned to the station, conferred with his superiors, and informed the deputies who had been at the scene of the search that, at the end of their patrol shift at approximately 6:00 a.m., they should return to the station. They were instructed not to leave work before speaking to internal affairs investigators.

Shortly before 6 a.m., Burke and Moreno informed plaintiff Elizabeth Aguilera that she and the other deputies were now

_____

be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

the focus of an internal criminal investigation. The Los Angeles County Sheriff's Department has two separate internal investigation units: the Internal Affairs Bureau ("IAB"), which investigates allegations of an administrative nature and can recommend employee discipline up to and including termination; and the Internal Criminal Investigation Bureau ("ICIB"), which only investigates allegations of a criminal nature for presentation to prosecuting attorneys who can pursue criminal charges against employees.

The deputies, each of whom had served in sworn law enforcement positions for five to twenty years with the Department, were familiar with Sheriff's Department policies and procedures regarding internal criminal investigations. Under the Sheriff's Department's Manual of Policies and Procedures, officers have an affirmative duty to cooperate during such an investigation. A failure to cooperate can subject a deputy to administrative discipline. The Department's policies allowed it to require its employees to remain at work beyond their normal shift. When this occurs, the Department compensates its personnel at overtime rates. The deputies had received training on how to manage and process persons suspected of criminal activity.

While the deputies waited at the station to be interviewed, they were told to remain in the report writing room, the basement roll call briefing room, and then the COPS team office, all of which were unlocked. While they were waiting, several supervisors later named as defendants entered the office intermittently to ask if the deputies needed anything to eat or drink. A drinking fountain was available. No one asked the deputies to relinquish their weapons or badges. The deputies were allowed to talk with each other, sleep, make and receive telephone calls, and travel to the bathroom unescorted.

The deputies were never placed under arrest, searched, physically restrained, or otherwise touched or subjected to the use of force. No deputy asked permission to leave the station.

While waiting to be interviewed, the deputies completed overtime slips. They later received overtime pay or were otherwise compensated for all time spent at the station after their regular shift had ended.

At approximately 6:30 a.m., the deputies were called to Captain Thomas Angel's office, the Commanding Officer of the East Los Angeles Station. According to the deputies, Captain Angel announced, in a harsh, accusatory manner, that he knew that one of them had used excessive force on Flores, that the others were covering it up, and that one or more of them could be criminally prosecuted or fired for doing so. Captain Angel informed the deputies that the only way to avoid criminal charges was to "come forward now," which they understood to mean to give an immediate and voluntary statement to the ICIB investigators without any protection against later use of such statements against them.

At around 11:30 a.m. or noon, Sergeant Russell Kagy of the ICIB, the lead criminal investigator assigned to the case, began interviewing each deputy sheriff individually. Kagy asked each deputy if he or she would provide a statement, and each declined based on the advice of counsel. No deputy was asked to waive his or her right against having any statement used against him or her in a later criminal proceeding, and no deputy gave either a compelled or voluntary statement at this time. The deputies were advised by Sergeant Kagy that they were not yet formally considered suspects, but at this time they could not be eliminated as suspects either. After each deputy declined to give a statement, Kagy terminated the interview, and the deputies were told they were free to leave the station.

None of the deputies under suspicion could initially be cleared of wrongdoing, and they were each then reassigned from their respective street patrol duties to station duties pending completion of the ongoing investigation into possible criminal violations of the civil rights of Flores. Each deputy

attests that the reassignment led to personal hardship.[2] Captain Angel asked each deputy to provide a written memorandum setting forth the specific circumstances of his or her hardship and how it related to the reassignments, but he did not receive any memoranda in response to his request. The deputies concede that the Department could change their shifts and assignments at will, and that being transferred to different shifts is a fairly common practice within the Sheriff's Department.

In the following two months, Sergeant Kagy conducted a thorough investigation into the events of September 5, 2002. Coordinating with prosecutors from the Los Angeles County District Attorney's Office and the United States Attorney's Office for the Central District of California, Kagy communicated and met with approximately two dozen individuals; reviewed Department files and audiotapes; and gathered medical records, 911 communication records, and photographs. In August 2003, Sergeant Kagy submitted the case investigation report to the District Attorney's Office for its consideration of filing criminal charges.

In September 2003, the District Attorney's Office requested compelled statements from deputies Aguilera, Ramirez, Carrillo and Arellano. During the process of extracting these compelled statements, none of the deputies were asked to waive his or her constitutional right against having the statement used against him or her in a criminal proceeding. Within

---

[2]Certain deputies allege that their temporary positions afforded decreased opportunity for earning overtime. However, according to the collective bargaining agreement negotiated between the Department and the deputies' bargaining representative (the Association for Los Angeles Deputy Sheriffs), deputies who are being investigated internally are not necessarily entitled to overtime assignments substantially related to the matters under inquiry. We read this agreement to mean that deputies being investigated for unlawfully assaulting a member of the public may not be entitled to overtime work assignments in the field involving unsupervised interactions with the public in case the complaint is later sustained by the results of the internal investigation.

days of providing their compelled statements to the investigators, the four deputies were cleared by their supervisors and restored to their pre-investigation duty assignments. Most of the deputies were reassigned in early October 2003. Deputy Bardon was not reassigned until December 2003 when the District Attorney declined to file criminal charges against him. No federal criminal charges were ever brought.

## II

We review a grant of summary judgment de novo. *Jones v. Union Pacific R.R. Co.*, 968 F.2d 937, 940 (9th Cir. 1992). An order granting summary judgment will only be affirmed if the evidence, read in the light most favorable to the non-moving party, demonstrates the absence of a genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. *Taylor v. List*, 880 F.2d 1040, 1044 (9th Cir. 1989).

Also subject to de novo review is the district court's grant of qualified immunity. *Elder v. Holloway*, 510 U.S. 510, 516 (1994). Under *Saucier v. Katz*, 533 U.S. 194, 201 (2001), we take a two-step approach in determining whether the defendant supervisors are entitled to qualified immunity. First, we determine whether the supervisors violated the deputies' constitutional rights. *See id.* If we answer in the affirmative, we proceed to determine whether that right was "clearly established" such that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *See id.* at 201-02. If we determine at the first step that no constitutional violation occurred, the qualified immunity inquiry is at an end. *See id.* at 201.

## III

[1] The deputies argue that their detention at their duty station pending questioning amounted to an impermissible seizure under the Fourth Amendment. We have not, before

today, had occasion to address whether and under what circumstances a law enforcement officer is seized under the Fourth Amendment when he is ordered by his supervisor to remain at a designated location for questioning about the officer's possible official misconduct triggering a criminal investigation. "A seizure of the person within the meaning of the Fourth and Fourteenth Amendments occurs when, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *Kaupp v. Texas*, 538 U.S. 626, 629 (2003) (internal quotation marks omitted). A seizure occurs when an individual submits to a show of lawful authority or an application of physical force by a law enforcement agent. *See California v. Hodari D.*, 499 U.S. 621, 626 (1991). An encounter between an officer and an individual "will not trigger Fourth Amendment scrutiny unless it loses its consensual nature." *Florida v. Bostick*, 501 U.S. 429, 434 (1991).

**[2]** The application of the Fourth Amendment to the employment context presents special issues. While "policemen, like teachers and lawyers, are not relegated to a watered-down version of constitutional rights," *Garrity v. New Jersey*, 385 U.S. 493, 500 (1967), the Constitution does not afford public employees greater workplace rights than those enjoyed by their private sector counterparts. When determining whether a superior law enforcement officer "seized" a subordinate, we must glean from the circumstances whether the subordinate's decision to heed his superior's order to remain at a designated location stemmed from a fear, if he tried to leave, of physical detention, or merely adverse employment consequences.

We are mindful that, "[o]rdinarily, when people are at work their freedom to move about has been meaningfully restricted, not by the actions of law enforcement officials, but by the workers' voluntary obligations to their employers." *INS v. Delgado*, 466 U.S. 210, 218 (1984). This is particularly so in

the paramilitary environment of a police agency that is both a law enforcer and a public employer. Police and sheriff's departments must frequently abide by collective bargaining agreements that govern in great detail the terms and conditions of the workplace. But society has an equally important interest in ensuring the highest integrity by those entrusted with discharging the duties of a peace officer.

**[3]** As a preliminary matter, we hold that a law enforcement agency has the authority as an employer to direct its officers to remain on duty and to answer questions from supervisory officers as part of a criminal investigation into the subordinates' alleged misconduct. *See Driebel v. City of Milwaukee*, 298 F.3d 622, 638 (7th Cir. 2002); *United States v. Muegge*, 225 F.3d 1267, 1270 (11th Cir. 2000) (per curiam) (finding no seizure when an on-duty civilian Air Force employee was ordered to report for an interview with an intelligence officer); *United States v. Baird*, 851 F.2d 376, 380-82 (D.C. Cir. 1988) (finding no seizure when an on-duty Coast Guard officer was ordered to report for an interview with an intelligence officer).[3] A law enforcement officer is not seized

---

[3]The dissent chastises us for our "selective reading" of *Baird*, *Muegge*, and *Driebel*, because in those cases the officers were either specifically told that their interviews were voluntary, *Baird*, 851 F.2d at 378, 380, 383; *Muegge*, 255 F.3d at 1270, or that they were not suspected of a particular crime, *Driebel*, 298 F.3d at 648. Although these statements certainly were factors that militated in favor of a finding that the officers were not in custody, they do not, as the dissent suggests, create a bright-line rule that the employer must unequivocally announce which "hat" (employer or law enforcement agent) it is wearing. Indeed, the case-by-case, fact specific inquiry has remained the same for several years and "is simply whether there is a formal arrest or restraint on movement of the degree associated with formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (internal quotation marks omitted). This is particularly so where the employer is a law enforcement agency and the employee is a sworn peace officer specially trained in constitutional rights attending the law of arrest. We can presume a greater degree of sophistication on that subject by these deputies than we would presume of the lay civil rights plaintiff encountering a police investigation for the first time. Further, the existence of a collective bargaining agreement that imposes a specific duty on police employees to cooperate in internal affairs investigations makes the context quite different from the run-of-the-mine civil rights case.

for purposes of the Fourth Amendment simply because a supervisor orders him to remain at work after the termination of his shift or to come into the station to submit to questioning about the discharge of his duties as a peace officer. *See Drie-* bel, 298 F.3d at 638. In the case at bar, if the deputies had refused to wait at the station to be questioned regarding the events of September 5, 2002, or otherwise failed to cooperate in the criminal investigation, they could have been subject to administrative discipline including termination. However, while a law enforcement agency can order its employees to cooperate in a criminal investigation as a condition of their continued employment subject to the Constitution, it may not seize its employees and detain them against their will without probable cause.[4] *See id.* at 639; *Cerrone v. Brown*, 246 F.3d 194, 201 (2d Cir. 2001). Nor may compelled statements be obtained in violation of their constitutional rights against self-incrimination without the protection afforded by Supreme Court decisions we discuss below.

**[4]** The first issue, then, is whether the deputies were seized without the existence of probable cause. Since the Fourth Amendment does not protect against the threat of demotions or job loss, the relevant constitutional inquiry is whether a reasonable deputy in the position of the plaintiffs would have feared detention if he had refused to obey the commands of his superior officers. *See United States v. Anderson*, 663 F.2d 934, 939 (9th Cir. 1981). Within this context, we must distinguish between a department's actions in its capacity as an employer and its actions as the law enforcement arm of the state. *See Gardner v. Broderick*, 392 U.S. 273 (1968); *Garrity*, 385 U.S. at 493.

In identifying which circumstances are most salient to our

---

[4]A superior law enforcement officer may briefly stop and question a subordinate officer consistent with the holding in *Terry v. Ohio*, 392 U.S. 1 (1968), as any police officer may do when he has a reasonable suspicion that criminal activity may be afoot.

analysis of whether a seizure took place, we find instructive the Seventh Circuit's analysis in *Driebel*, 298 F.3d at 622. There, our sister appellate court considered the Fourth Amendment claims of four police officers who had been ordered to remain on duty or to accompany detectives to headquarters and answer questions during the course of an internal criminal investigation of possible misconduct involving the acquisition by police officers of unregistered firearms from nefarious sources. The court determined that two officers had been seized when detectives surveilled a pickup point and uniformed officers arrived to retrieve the weapons hidden in a dumpster. The court determined that two others had not been seized but merely submitted to conditions of their employment when ordered to return to the station for further questioning. *See id.* at 641.

The Seventh Circuit emphasized the following factors as critical to its calculus of whether a seizure had taken place: the experience level of the subordinate officer, *see id.* at 647; whether the treatment was consistent with that allowed by department guidelines or general policy, *see id.* at 649 n.16; the occurrence of physical contact or threats of physical restraint, *see id.* at 646, 647, 649 & n.16; explicit refusal of permission to depart, *see id.* at 649 n.16; isolation of the subordinate officer, *see id.* at 643, 649 n.16; permission to use the restroom without accompaniment, *see id.* at 648, 649 n.16; the subordinate officer's being informed that he was the subject of a criminal investigation, *see id.* at 643; whether the subordinate officer was spoken to "in a menacing or threatening manner," *see id.* at 648, 649 n.16; whether the subordinate officer was under constant surveillance, *see id.* at 646; whether superior officers denied a request to contact an attorney or union representative, *see id.* at 648; the subordinate officer's ability to retain law enforcement equipment, including weapons and badges, *see id.* at 643, 648, 649 n.16; the duration of detention, *see id.* at 646; and the subordinate officer's receipt of overtime pay, *see id.* at 643.

**[5]** We adopt the reasoning articulated in *Driebel*. Applying these factors to the detention of the deputies in the case at bar, we hold that they were not seized within the meaning of the Fourth Amendment. Each deputy had at least five years of experience and testified to his or her familiarity with the Department's policies and state criminal law. The deputies were well versed through their police academy and on-the-job training in Department procedures regarding the manner in which individuals are placed under arrest and the Department's statutory and contractual authority to order officers to remain at work on overtime. In addition, each deputy accepted as a condition of his or her employment the official policy that he or she must cooperate with other members of the Department conducting an internal criminal investigation.

**[6]** While the deputies waited to be interviewed, the Department did not employ standard procedures for detaining criminal suspects at the station, such as searching them, booking them, and inventorying their possessions. The deputies must have been aware that, without probable cause, no superior officer was permitted to use force or any show of authority to prevent them from departing the station if they so chose. While the deputies obviously understood that any violation of the order not to leave work might breach administrative rules and could result in their discipline as employees, we do not think that prospect is sufficient to classify this situation as a criminal seizure.

**[7]** The Department did not create a coercive environment in which to detain the deputies. The deputies were not transported to the station against their will. They were not held in a cell, but rather in unlocked rooms with intermittent supervision. The Department did not refuse any deputy's request to depart (though no one asked to leave). Supervisors repeatedly asked the deputies if they wanted food or drink and allowed them to travel to the restroom and water fountain unaccompanied. The deputies were not prevented from phoning their attorney or union representative for legal or contractual advice

and remained in possession of their Department-issued equipment, including weapons and badges. The deputies were never touched or threatened with physical restraint. They were not isolated from one another or prohibited from speaking with one another. After the deputies were questioned and declined to provide an unprotected statement, they were immediately allowed to leave the station. All were paid overtime. In short, the deputies were not treated like criminal suspects, and they should have known—given their training, years on the force, and familiarity with Department procedures and protocol—that, if they chose to leave the station in defiance of their supervisors' orders, they might have been subject to administrative discipline but could not have been forcibly detained absent full physical arrest.

**[8]** Admittedly, some factors militate toward finding that a seizure took place. In particular, the deputies were informed that they were under criminal investigation. In addition, Captain Angel, the highest ranking officer at the station, conveyed in a "harsh, accusatory tone" his belief that one of the deputies had assaulted Flores, he insinuated that the others were covering it up, and he further warned that one or more of them would go to prison and lose their jobs if they were involved in such behavior. While the message may have been delivered in a harsh tone of voice to convince his subordinates that the Captain meant what he said in the hopes of piercing the "blue shield" of silence he thought he was facing, we are not prepared to believe that trained deputy sheriffs would nonetheless have been confused as to their legal and contractual rights under the circumstances. We believe that a reasonable deputy in the plaintiffs' position would have understood that he was ordered to report and remain at the station until interviewed by ICIB investigators, and that he would likely suffer criminal civil rights prosecution and administrative discipline if the evidence revealed his involvement in the assault of Flores. However, these facts are not sufficient, in and of themselves, to transform the deputies' voluntary accession to

their supervisors' order to remain at work into a seizure cognizable as an arrest under the Fourth Amendment.

**[9]** We decline to hold that the deputies were seized by their supervisors' orders, which were issued in accordance with Department policies, to cooperate with a necessary internal criminal investigation. To hold otherwise would equate to a pronouncement that a law enforcement agency cannot, even under negotiated provisions of a labor agreement or the agency's general policies to preserve public confidence and the integrity of its personnel in the discharge of their public safety responsibilities, order its employees to cooperate in an investigation of possible officer misconduct by standing by at their duty station after the end of their watch. We do not intend to, and will not, act as a super-personnel board to micromanage the employment actions of law enforcement professionals. "Law enforcement agencies are entitled to deference, within reason, in the execution of policies and administrative practices that are designed to preserve and maintain security, confidentiality, internal order, and esprit de corps among their employees." *Driebel*, 298 F.3d at 648. We affirm the district court's grant of summary judgment on the deputies' Fourth Amendment claim.

IV

The deputies contend they were deprived of their Fifth Amendment right (made applicable to the states by the Fourteenth Amendment) against self-incrimination. The deputies argue that supervisors violated this right by forcing them to choose between giving a voluntary, non-immunized statement that could be used against them in subsequent criminal or administrative proceedings and retaining their current job assignments and work shifts. The deputies' argument is unavailing.

**[10]** In a series of cases involving the Fifth Amendment rights of public employees, the Supreme Court has made clear

that public employees cannot be compelled to chose between providing unprotected incriminating testimony or losing their jobs. *See Uniformed Sanitation Men Ass'n v. Comm'r of Sanitation*, 392 U.S. 280 (1968) (holding that the discharge of city employees for refusing to sign waivers of immunity or for invoking their privilege against self-incrimination violated the Fifth Amendment); *Gardner*, 392 U.S. at 273 (same); *Garrity*, 385 U.S. at 493 (holding that the state cannot use the incriminatory statement of an employee secured under threat of job loss in a subsequent criminal proceeding); *see also Lefkowitz v. Cunningham*, 431 U.S. 801, 806 (1977) (holding that the "government cannot penalize assertion of the constitutional privilege against compelled self-incrimination by imposing sanctions to compel testimony which has not been immunized").

[11] The Court was careful, however, to preserve the right of a public employer to appropriately question an employee about matters relating to the employee's possible misconduct while on duty. In *Gardner*, the Court noted that the constitutional violation arose not when a public employee was compelled to answer job-related questions, but when that employee was required to waive his privilege against self-incrimination while answering his employer's legitimate job-related questions. *See* 392 U.S. at 278. If the officer "had refused to answer questions specifically, directly, and narrowly relating to the performance of his official duties, without being required to waive his immunity with respect to the use of his answers or the fruits thereof in a criminal prosecution of himself, the privilege against self-incrimination would not have been a bar to his dismissal." *Id.* (footnote and citation omitted); *see also Uniformed Sanitation Men*, 392 U.S. at 284; *Lefkowitz*, 431 U.S. at 806 ("Public employees may constitutionally be discharged for refusing to answer potentially incriminating questions concerning their official duties if they have not been required to surrender their constitutional immunity."); *Chavez v. Martinez*, 538 U.S. 760, 768-69 & n.2 (2003) (outlining the scope of public employees' rights under

the Fifth Amendment self-incrimination clause). "This language strongly indicates that forcing a public employee to answer potentially incriminating job-related questions does not implicate the Fifth Amendment unless the employee is also compelled to waive his privilege." *Wiley v. Mayor & City Council of Baltimore*, 48 F.3d 773, 777 (4th Cir. 1995).

**[12]** We hold that the supervisors did not violate the deputies' Fifth Amendment rights when they were questioned about possible misconduct, given that the deputies were not compelled to answer the investigator's questions or to waive their immunity from self-incrimination. Indeed, it appears that the deputies were never even *asked* to waive their immunity.[5] In these circumstances, it is clear that the deputies' Fifth Amendment right against self-incrimination was not implicated by the supervisors' conduct. *See Hill v. Johnson*, 160 F.3d 469, 471 (8th Cir. 1998) (holding that "[t]he Fifth

---

[5]Our colleague in dissent maintains that there is a factual dispute as to whether the officers were compelled to make incriminating statements. If compelled, on the one hand, the officers automatically would be entitled to immunity for any incriminating statements they made. *Minnesota v. Murphy*, 465 U.S. 420, 434 (1984). If not under compulsion, on the other hand, then they had the constitutional right to remain silent without fear of punishment. *Lefkowitz*, 414 U.S. at 84-85. The factual dispute arises, the dissent insists, because Captain Angel, "by including the risk of prison as one of the consequences of not speaking . . . was clearly doing something other than giving a command to a subordinate." Dissent at 16813.

However, as the Supreme Court emphasized in *Gardner*, the Constitution is offended not when an officer is compelled to answer job-related questions, but only when the officer is required to waive his privilege against self incrimination while answering legitimate job-related questions. 392 U.S. at 278. Although there may have been some initial coercion to *cooperate and answer* questions, the record does not support a triable issue of fact as to whether the tandem requirement of *compelling* the officers to waive their Fifth Amendment rights was met. *Wiley*, 48 F.3d at 777 (reasoning that "forcing a public employee to answer potentially incriminating job-related questions *does not implicate the Fifth Amendment unless the employee is also compelled to waive his privilege*") (emphasis added). Indeed, the deputies were not asked to waive their immunity. Nor were any statements ever used against them.

Amendment is violated only by the combined risks of both compelling the employee to answer incriminating questions and compelling the employee to waive immunity from the use of those answers"); *Wiley*, 48 F.3d 773 (holding that officers' Fifth Amendment rights were not violated given that the officers had not been asked to waive their privilege against self-incrimination and the questions posed to them were narrowly job-related).[6] It is of no moment that refusing to answer the

---

[6]The dissent believes that the only constitutionally permissible rule is one that would require public employers to expressly inform employees that "any statements they give can't be used against them in criminal proceedings" before taking disciplinary action against the employee for refusing to speak. Dissent at 16814. This rule, it retorts, would be "easy as pie" to administer and no legitimate argument exists against such an approach. Dissent at 16816. Indeed, the dissent complains, by adopting "the harsh and unfair rule of the Fifth and Eighth Circuits, [w]e permit[ ] the government to punish police officers who refuse to make self-incriminating statements, even though they may not be sure whether or not they have immunity." Dissent at 16814.

Despite the facial appeal of the rule that the dissent would like us to apply with twenty-twenty hindsight, the contours of permissible public employer conduct have been articulated by the Supreme Court. It is well established that a police supervisor may not compel a subordinate to waive his privilege against self- incrimination. *Gardner*, 392 U.S. at 278. But this mandate does not, as the dissent suggests, require the adoption of the dissent's bright-line rule, adopted by the Second, Seventh, and Federal Circuits. *See Weston v. United States Dep't. of Housing & Urban Dev.*, 724 F.2d 943, 948 (Fed Cir. 1983); *Confederation of Police v. Conlisk*, 489 F.2d 891, 895 & n.4 (7th Cir. 1973); *Uniformed Sanitation Men Ass'n v. Comm'r of Sanitation of N.Y.*, 426 F.2d 619, 621, 627 (2d Cir. 1970).

No matter how appealing such a variation on Supreme Court precedent may be, the rule is not required by *Gardner*. Significantly, the dissent continually glosses over critical facts. Although it notes that *Miranda* warnings have "become part of our national culture," *Dickerson v. United States*, 530 U.S. 428, 443 (2000), this case involves deputies who are charged with administering *Miranda* warnings to suspects in the course of their official duties. These deputies had at least five years experience each, testified to familiarity with Department policy and criminal law, and were versed in the Department's procedures for placing suspects under arrest. Finally, to impose this bright-line rule, and therefore liability on the supervisors, would be unnecessarily harsh and in contravention of basic quali-

investigator's questions could have resulted (and, in fact, did result) in reassignment: We do not consider re-assignment from field to desk duty as equivalent to losing one's job under *Gardner*, 392 U.S. at 273.[7]

**[13]** The deputies' Fifth Amendment claim also fails because the deputies were never charged with a crime, and no incriminating use of their statements has ever been made. In *Chavez*, 538 U.S. at 769 (plurality opinion),[8] the Supreme Court held that "mere coercion does not violate the text of the Self-Incrimination Clause absent use of the compelled statements in a criminal case against the witness." Only after a compelled incriminating statement is used in a criminal proceeding has an accused suffered the requisite constitutional injury for purposes of a § 1983 action. *See id.*; *United States v. Antelope*, 395 F.3d 1128, 1140-41 (9th Cir. 2005) (discussing *Chavez* and limiting the reach of its holding to the context

---

fied immunity principles. *Gardner* does not require, nor is it clearly established law in our circuit, that a public employer must expressly inform an employee that his statements regarding actions within the course and scope of his employment cannot be used against him in a criminal proceeding before taking administrative action against that employee. *See Saucier*, 533 U.S. at 202.

[7]The dissent bemoans this *dicta* statement because the Supreme Court has rejected the notion that actions short of firing a public employee cannot form the basis of a viable Fifth Amendment claim. *See Rutan v. Republican Party of Ill.*, 497 U.S. 62, 76 n.8 (1990) (reasoning that "even an act as trivial as failing to hold a birthday party for a public employee . . . when intended to punish her for exercising her [constitutional] rights," offends the Constitution) (internal quotation marks omitted). This point is largely moot because we agree with the district court's observation that the supervisors' actions in this case "w[ere] [not] done to punish [the deputies] for asserting their constitutional rights." Dissent at 16817.

[8]Agreeing on this holding were Chief Justice Rehnquist and Justices Thomas, O'Connor, Scalia, Souter, and Breyer. *See id.* at 763, 773 (Op. of Thomas, J., joined by Rehnquist, C.J., and O'Connor and Scalia, J.J.); *id.* at 777-79 (Op. of Souter, J., joined by Breyer, J.). *See McKinley v. City of Mansfield*, 404 F.3d 418, 431 n.12 (6th Cir. 2005).

of § 1983 actions); *see also Lingler v. Fechko*, 312 F.3d 237, 240 (6th Cir. 2002) (holding that a police officer's Fifth Amendment right was not violated because he had not been compelled to waive his privilege against self-incrimination and his statements were never used against him in subsequent criminal proceedings).[9] We affirm the district court's grant of summary judgment on this claim.

V

**[14]** The deputies argue that the district court erred in concluding that the supervisors' conduct did not violate the deputies' Fourteenth Amendment substantive due process rights. In our view, the Sheriff's Department had a legitimate need to determine whether an officer or officers had engaged in criminal behavior under color of office and, until that criminal investigation was resolved, it had a duty to protect the public from the potential for further assaults by the unknown deputy potentially responsible by reassigning all of those involved in the incident to station duty. Even assuming that the deputies were assigned to less favorable shifts and given "degrading" employment positions, we agree with the district court that the reassignment did not transform the questioning into a coercive police investigation under *Cooper v. Dupnik*, 963 F.2d 1220 (9th Cir. 1992). We also agree that a reassignment, even as punishment for failure to make a voluntary statement, does not "shock[ ] the conscience" or run counter to the "decencies of civilized conduct" under *Rochin v. California*, 342 U.S. 165 (1952). We affirm the grant of summary judgment on these claims.

---

[9]The dissent makes too much of our citation to *Chavez v. Martinez*, 538 U.S. at 760. Plainly, *Chavez* applies in situations where a party actually makes an incriminating statement and the government then decides to use it in a criminal proceeding. If it does so, the Fifth Amendment is violated. Otherwise, it is not. Here, we rely on the rule in *Chavez* primarily for the proposition that since no statement was ever used against the deputies, there is no cognizable Fifth Amendment claim.

VI

**[15]** The district court disregarded police reports of Sergeant Kagy's internal investigation, which documented the allegations against the deputies, on the basis that they constituted inadmissible hearsay and were not sufficiently reliable to qualify for the business records exception. *See* Fed. R. Evid. 803(6). The deputies contend on appeal that they offered the reports for the non-hearsay purpose of proving the supervisors' knowledge of exculpatory facts clearing the deputies of the alleged misconduct on a date much earlier than that on which their former field duties were restored. However, even if the district court erred in failing to consider the reports, we find any error harmless since, even considering the information in the reports, the deputies' Fifth Amendment and Fourteenth Amendment claims fail as a matter of law.

VII

Because we find that the supervisors did not violate the deputies' Fourth, Fifth, or Fourteenth Amendment rights, we affirm the district court's grant of summary judgment in favor of all defendants. Since no violation of any constitutional right occurred, we need not reach the claim against the County under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). It too was properly dismissed.

**AFFIRMED.**

KOZINSKI, Chief Judge, dissenting for the most part:

When a law enforcement agency suspects one of its employees of criminal wrongdoing, their relationship becomes a strained and complex one. The employer, of course, retains all powers over the employee qua employer— it may ask him to work overtime, complete reports, answer

the questions of supervisors and generally comply with the terms of the employment relationship. In addition, however, the employer is also in the business of detecting and prosecuting criminal activity, so the employer can—and generally has the duty to—gather evidence that may be used to prosecute the employee and others.

Whether the employer is wearing one hat or the other (or both) is often unclear, which can put the employee in a precarious situation by forcing him to choose between disobeying an order from his employer and giving up the constitutional privilege against self-incrimination. In such situations, the employer must not play on this ambiguity to the disadvantage of the employee; rather, it must clarify whether it is questioning the employee in its capacity as an employer or as a law enforcer. Where the employer fails to do this, the employee is entitled to act on the assumption that he is dealing with a law enforcement agency, if a reasonable person in his position would have so believed. Plaintiffs here easily meet this standard, and so they are entitled to bring their case before a jury; this is precisely the kind of conflict that a group of citizens drawn from the community is in the best position to resolve.

### 1. *Arrest Without Probable Cause*

Plaintiffs here presented a triable issue of fact on their claim that they were arrested without probable cause because a jury could find, on the evidence presented, that reasonable people in plaintiffs' position would have believed they were placed under arrest and not merely asked to work overtime. As the majority admits with commendable candor, there is evidence that "militate[s] toward finding that a seizure took place." Maj. op. at 16801. After all, plaintiffs were told they were under criminal investigation, and they were interviewed by the Internal Criminal Investigation Bureau (ICIB), which investigates only criminal allegations against employees. *Id.* at 16792. Moreover, plaintiffs' superior, Captain Angel,

speaking in a "harsh, accusatory manner," told them that he knew one of them had used excessive force on Flores, that the others were covering up and that one or more of them would go to prison and lose their jobs unless they gave statements. *Id.* at 16793.

The majority relies on three cases in support of its finding that plaintiffs were not detained, but cites them only selectively. *Id.* at 16797. *United States* v. *Baird*, 851 F.2d 376 (D.C. Cir. 1988), found no seizure because the Coast Guard officer there was told that the interview was "voluntary" and that he "was free to go whenever he wanted to." *Id.* at 378; *see id.* at 380, 383. *United States* v. *Muegge*, 225 F.3d 1267 (11th Cir. 2000) (per curiam), found no seizure because the public employee "was told he was free to leave at any time and did not have to answer any questions." *Id.* at 1270. *Driebel* v. *City of Milwaukee*, 298 F.3d 622 (7th Cir. 2002), turned on the fact that the police officer there "was never informed that he was the suspect for any particular crime, nor was he spoken to in a menacing or threatening manner." *Id.* at 648.

Our case is materially different from *Baird*, *Muegge* and *Driebel*. Plaintiffs weren't told they were free to leave, and they weren't told they didn't have to answer questions. *Cf. Muegge*, 225 F.3d at 1270; *Baird*, 851 F.2d at 378. Instead, plaintiffs were told they were suspects in a criminal investigation, and their superior spoke to them in a harsh, accusatory tone and threatened criminal sanctions. *Cf. Driebel*, 298 F.3d at 648. A seizure may be effected solely by "the use of language or tone of voice indicating that compliance with the officer's request would be compelled." *Martinez* v. *Nygaard*, 831 F.2d 822, 826 (9th Cir. 1987). Given the context, plaintiffs could reasonably have believed that they had to stay at the police station on pains of arrest. At least, a reasonable jury could so find.

I don't share the majority's worry that letting this case go to trial would undermine the employer's authority to insist

that employees remain on duty past their shifts to answer questions. *See* maj. op. at 16802. An employer can exercise that right without difficulty if he makes it clear that the employees are not under arrest and he avoids the kind of accusations Captain Angel hurled at plaintiffs here. But where the employer brings in criminal investigators, yells at the employees, accuses them of crimes, threatens them with criminal punishment and does *not* make it clear that they're *not* under arrest, a reasonable jury could find that the employees were seized.

If plaintiffs were arrested, the seizure was unconstitutional because the police had no probable cause. *Dunaway* v. *New York*, 442 U.S. 200, 216 (1979). Flores never identified the officer who hit him. Instead, he claimed to have been hit by a male deputy who was possibly Hispanic, but all of the officers in the area were Hispanic and all but one were male. That one member of a group may have committed a crime doesn't establish probable cause to arrest everyone in that group. *United States* v. *Brown*, 951 F.2d 999, 1003 (9th Cir. 1991).

Nor were defendants entitled to qualified immunity because the law on unconstitutional seizures was "clearly established" at the time of the incident. *Saucier* v. *Katz*, 533 U.S. 194, 202 (2001). No reasonable officer would have believed that he could arrest plaintiffs based on the evidence available. If a jury determines that plaintiffs were in fact arrested when they were detained at the police station, they would be entitled to damages—if only nominal ones—for the harm they suffered as a result of the unlawful arrest. I would therefore reverse the district court's grant of summary judgment for defendants on plaintiffs' Fourth Amendment claims and remand for trial on the issue.

## 2. *Retaliation*

Plaintiffs claim that defendants retaliated against them for failing to provide statements about the Flores incident for

about a year—until defendants explicitly ordered them to provide such statements. According to plaintiffs, only at that point could they be sure that their statements could not be used against them in criminal proceedings and so they reasonably remained silent to preserve their constitutional privilege against self-incrimination. If defendants had really wanted those statements, they could easily have ordered plaintiffs to provide them at any time following the incident, and thereby have removed all doubt as to whether the statements could be used to prosecute plaintiffs. Instead, defendants played cat and mouse with plaintiffs for 12 months, forcing plaintiffs to guess whether any statements they gave could be used to prosecute them. In other words, defendants put economic pressure on plaintiffs to give up their Fifth Amendment rights —or so a jury could reasonably find on this record. I would therefore remand on this issue as well, and allow it to go to trial.

My disagreement with the majority proceeds along four lines:

**a.** First, I believe there is genuine doubt as to whether plaintiffs were under compulsion to give a statement, and thus whether any statements they gave could have been used to prosecute them. Certainly, there was no express order. The closest we have is Captain Angel's statement on the morning following the incident, where he spoke to plaintiffs in a harsh, accusatory manner and told them that they could go to prison or lose their jobs if they did not give statements. But it's not clear that this was an order; it might have been a prediction or a threat. Or, Captain Angel might have been using a variant of the Prisoner's Dilemma by suggesting that each of the officers try to save his own skin by pointing the finger at one or more of the others.

Significantly, Captain Angel mentioned that plaintiffs could go to prison if they did not make statements; disobeying an employer's order can result only in job discipline, never

criminal punishment. By including the risk of prison as one of the consequences of not speaking, Captain Angel was clearly doing something other than giving a command to a subordinate. Had some of the plaintiffs given statements, and had they been used against them in criminal proceedings, the prosecution would doubtless have claimed that plaintiffs waived their privilege against self-incrimination because Captain Angel's statement was *not* a command. I can't say for sure that such an argument would have failed.

Whether a person faces compulsion is a question of fact, *see United States* v. *Ryan*, 548 F.2d 782, 789 (9th Cir. 1976), and plaintiffs have raised a genuine dispute as to whether they were under compulsion to give statements. A jury might well look at the situation—including the fact that defendants could have removed all doubt on the subject by giving plaintiffs a direct order—and conclude that plaintiffs were not under compulsion.

This factual dispute is material because, whether plaintiffs faced government compulsion determines whether they had immunity, which in turn determines whether they could be punished for refusing to make self-incriminating statements. Public employees *automatically* have immunity when they are compelled to make self-incriminating statements during criminal investigations related to their official duties. *See Minnesota* v. *Murphy*, 465 U.S. 420, 434 (1984); *Uniformed Sanitation Men Ass'n* v. *Comm'r of Sanitation of N.Y.*, 392 U.S. 280, 284 (1968); *Gardner* v. *Broderick*, 392 U.S. 273, 278 (1968); *Garrity* v. *New Jersey*, 385 U.S. 493, 500 (1967). When a public employee is ordered to speak, his statements can't be used against him in a criminal proceeding, and he can therefore be subjected to adverse employment consequences for refusing to speak. *See Gardner*, 392 U.S. at 276, 278. But if plaintiffs weren't *compelled* to make self-incriminating statements, they didn't automatically have immunity. And, if they had no immunity, they were constitutionally entitled to remain silent. Reasonable jurors could find that plaintiffs

didn't have immunity, thus making it unconstitutional for defendants to punish them for refusing to make self-incriminating statements. *See Lefkowitz* v. *Turley*, 414 U.S. 70, 84-85 (1973); *Uniformed Sanitation Men*, 392 U.S. at 283; *Gardner*, 392 U.S. at 276, 278.

**b.** Second, I would hold that if the government doesn't expressly inform public employees that any statements they give can't be used against them in criminal proceedings, it may not punish them for refusing to speak. This strikes me as the only constitutionally permissible rule. It is also the only just rule, and police officers are entitled to be treated justly and with dignity, no less than anyone else. The majority, instead, adopts the harsh and unfair rule of the Fifth and Eighth Circuits by permitting the government to punish police officers who refuse to make self-incriminating statements, even though they may not be sure whether or not they have immunity. *See Hill* v. *Johnson*, 160 F.3d 469, 471 (8th Cir. 1998); *Gulden* v. *McCorkle*, 680 F.2d 1070, 1075 (5th Cir. 1982).

The Second, Seventh and Federal Circuits have the better approach: The government must tell public employees that they have immunity before it can constitutionally punish them for refusing to make self-incriminating statements. *See Weston* v. *U.S. Dep't of Hous. & Urban Dev.*, 724 F.2d 943, 948 (Fed. Cir. 1983); *Confederation of Police* v. *Conlisk*, 489 F.2d 891, 895 & n.4 (7th Cir. 1973); *Uniformed Sanitation Men Ass'n* v. *Comm'r of Sanitation of N.Y.*, 426 F.2d 619, 621, 627 (2d Cir. 1970) (Friendly, J.).[1] It's common knowledge that the Fifth Amendment protects the privilege against self-

[1]State courts—including California where these events took place—have also adopted this position. *See, e.g.*, *Eshelman* v. *Blubaum*, 114 Ariz. 376, 378-79 (Ct. App. 1977); *Lybarger* v. *City of L.A.*, 40 Cal. 3d 822, 829 (1985); *Gandy* v. *State ex rel. Div. of Investigation & Narcotics*, 96 Nev. 281, 284 (1980); *City of Warrensville Heights* v. *Jennings*, 58 Ohio St. 3d 206, 209-10 (1991).

incrimination, as this is explained in the *Miranda* warning which has "become part of our national culture." *Dickerson* v. *United States*, 530 U.S. 428, 443 (2000). A public employee under criminal investigation should be able to rely on the privilege against self-incrimination, as plaintiffs did here, until he is told in clear terms that the statements can't be used to prosecute him.

We treat immunity as a substitute for the Fifth Amendment privilege against self-incrimination because immunity "leaves the witness and the [government] in substantially the same position as if the witness had claimed his privilege." *Kastigar* v. *United States*, 406 U.S. 441, 458-59 (1972) (quoting *Murphy* v. *Waterfront Comm'n*, 378 U.S. 52, 79 (1964)). Usually, the government needs to affirmatively grant immunity, *see id.* at 459, which concurrently informs the witness that he has immunity. The same is not true where the immunity kicks in automatically, such as when a government employee is ordered to give a statement during the course of a criminal investigation. The employee may, first of all, have doubts as to whether or not he has been *ordered* to give the statement. This case amply demonstrates this ambiguity and there are numerous other fact patterns where it would not be clear whether the employee has been ordered to speak. I see no justification for forcing the employee to guess whether or not he's been given an order and, hence, whether he has immunity. *See* pp. 16812-14 *supra*.

But even when it is clear that the employee has been given an order, the employee may not know that this gives him automatic immunity. Automatic immunity only leaves a public employee "in substantially the same position as if the [employee] had claimed his privilege," *Kastigar*, 406 U.S. at 458-59, when the employee *knows* without a doubt that he has immunity. *See Hill*, 160 F.3d at 472-73 (Heaney, J., dissenting); *Kalkines* v. *United States*, 473 F.2d 1391, 1395 (Ct. Cl. 1973). After all, "[t]he logic underlying *Gardner* is that an officer under investigation is not required to speculate as to

what his constitutional rights are." *Lybarger* v. *City of L.A.*, 40 Cal. 3d 822, 834 (1985) (Bird, C.J., concurring). A person who doesn't know he has immunity, like the plaintiffs here, *see* maj. op. at 16793, would justifiably believe that "any statement he [makes] may be used . . . against him." *Miranda* v. *Arizona*, 384 U.S. 436, 444 (1966).

We can't expect public employees who are pressured to give a statement to know that they have immunity. I, for example, had no idea, even though I have been a government employee involved in law-related activities for almost three decades. The employer is in complete control of these situations, and it would be easy as pie for supervisors to inform employees that they have been ordered to speak and therefore have immunity. I can see no legitimate argument against this simple and easily administered rule, which would avoid the kind of mess we have here.

**c.** Third, the majority's reliance on *Chavez* v. *Martinez*, 538 U.S. 760 (2003), *see* maj. op. at 16806-07, is misplaced because *Chavez* only applies where a party actually makes self-incriminating statements. In *Chavez*, the Supreme Court held that there is no Fifth Amendment violation when someone makes a self incriminating statement but that statement is never used against him. *Chavez*, 538 U.S. at 769 (plurality opinion); *id.* at 777-79 (Souter, J., concurring in the judgment). The majority tries to import the *Chavez* rule—a Fifth Amendment violation can only occur when a self-incriminating statement is used against someone—into cases, like this one, where there are no self-incriminating statements. But *Chavez* itself rejected this. The Court there explicitly stated that the government couldn't "penalize public employees . . . to induce them to waive their *immunity*." *Id.* at 768 n.2 (plurality opinion). So, under *Chavez*, the Fifth Amendment would be violated if a public employee were fired for refusing to make self-incriminating statements, even though no self-incriminating statement could ever have been used against the employee.

**d.** Fourth, contrary to Supreme Court precedent, the majority would only find unconstitutional retaliation for actions taken against public employees that are the "equivalent to losing one's job." Maj. op. at 16806. The Court has rejected the argument that "only those employment decisions that are the substantial equivalent of a dismissal violate a public employee's [constitutional rights]." *Rutan* v. *Republican Party of Ill.*, 497 U.S. 62, 75 (1990) (internal quotation marks omitted). Here, plaintiffs allege that they were reassigned to less prestigious desk jobs and that they were denied promotions because they refused to make self-incriminating statements. If this was done to punish them for asserting their constitutional rights, it would be unconstitutional, as "even an act of retaliation as trivial as failing to hold a birthday party for a public employee . . . when intended to punish her for exercising her [constitutional] rights," violates the Constitution. *Id.* at 76 n.8 (internal quotation marks omitted).

Defendants are not entitled to qualified immunity on plaintiffs' Fifth Amendment claims, because it was "clearly established," *Saucier*, 533 U.S. at 202, that plaintiffs couldn't be retaliated against for refusing to make self-incriminating statements if they didn't have immunity. *See Murphy*, 465 U.S. at 429, 436 n.7; *Gardner*, 392 U.S. at 276, 278. Plaintiffs could thus also proceed with their conspiracy claims against the individual defendants. Additionally, municipalities aren't protected by qualified immunity, *see Owen* v. *City of Independence*, 445 U.S. 622, 650 (1980), so plaintiffs should likewise be entitled to proceed with their *Monell* v. *Department of Social Services of New York*, 436 U.S. 658 (1978), claims against the County and Sheriff's Department. I would therefore reverse the district court's grant of summary judgment for defendants on plaintiffs' retaliation claims and remand for trial on these issues as well.[2]

---

[2]Because I would hold that plaintiffs could establish a Fifth Amendment violation, the district court's exclusion of Sergeant Kagy's ICIB report

\* \* \*

I dissent from Parts III, IV, VI and VII. I join Part V because defendants didn't violate plaintiffs' substantive due process rights.

---

wasn't harmless error. Rather, the district court abused its discretion in excluding the report because plaintiffs offered it for the non-hearsay purpose of proving the police department knew that plaintiffs hadn't harmed Flores months before plaintiffs were returned to their pre-investigatory duty assignments. *See Standard Oil Co. of Cal.* v. *Moore*, 251 F.2d 188, 217 n.36 (9th Cir. 1958).