[Cite as *Maldonado v. Ohio Dept. of Jobs & Family Servs.*, 2012-Ohio-4555.]

STATE OF OHIO, MAHONING COUNTY
IN THE COURT OF APPEALS
SEVENTH DISTRICT

| | | |
|---|---|---|
| IVAN MALDONADO | ) | CASE NO. 10 MA 190 |
| | ) | |
| APPELLANT | ) | |
| | ) | |
| VS. | ) | OPINION |
| | ) | |
| DIRECTOR, OHIO DEPARTMENT OF | ) | |
| JOB AND FAMILY SERVICES, et al. | ) | |
| | ) | |
| APPELLEES | ) | |

CHARACTER OF PROCEEDINGS:     Civil Appeal from the Court of Common
Pleas of Mahoning County, Ohio
Case No. 10 CV 397

JUDGMENT:                                    Affirmed.

APPEARANCES:
For Appellant:                                  Atty. Ira J. Mirkin
Atty. Charles Oldfield
Green, Haines, Sgambati Co., LPA
16 Wick Avenue, Suite 400
P.O. Box 849
Youngstown, Ohio  44501-0849

For Appellee, Director, ODJFS:        Atty. Mike DeWine
Attorney General of Ohio
Atty. Susan M. Sheffield
Assistant Ohio Attorney General
20 West Federal Street, 3rd Floor
Youngstown, Ohio  44503

Special Counsel For Appellee, YSU:   Atty. George S. Crisci
Zashin & Rich Co., LPA
55 Public Square, 4th Floor
Cleveland, Ohio  44113

JUDGES:
Hon. Cheryl L. Waite
Hon. Cynthia Rice, of the Eleventh District Court of Appeals, sitting by assignment.
Hon. Mary Jane Trapp, of the Eleventh District Court of Appeals, sitting by
assignment.

                                                      Dated:  September 28, 2012

[Cite as *Maldonado v. Ohio Dept. of Jobs & Family Servs.*, 2012-Ohio-4555.]
WAITE, P.J.

## Summary

{¶1}   Appellant Ivan Maldonado was a payroll specialist at Youngstown State University and president of one of its unions.  As union president he was party to a letter of agreement that secured employment for the outgoing union president without complying with the advertising requirements of the collective bargaining agreement.  Although this agreement was intended to be kept secret, it was released and was circulating among the members of the bargaining unit.  When Appellant learned who was circulating the agreement, he called her and told her that continuing to circulate the document would be "bad for her health."  When another member of the unit called to ask him about the contents of the letter, Appellant announced his intention to slice the throats of the three people he thought originally circulated the letter of agreement.  As the conversation continued, Appellant referred to other female employees by using extremely crude and derogatory language.  Both incidents were reported to the campus police.  Appellant was placed on administrative leave.  The matter was investigated and a disciplinary hearing was held.  In addition to the more recent incidents, a prior incident was introduced at hearing where Appellant, whose position was being audited for a pay increase, threatened the woman conducting the audit that if she did not quickly approve the increase it would make him very angry and she did not want him to get angry.  During Appellant's administrative leave various incidents of mistake, intentional omission and/or inaccuracy were discovered in his work.  After the disciplinary hearing, Appellant was terminated for making threats against other employees, the use of lewd or indecent language and nonperformance

of duties. Appellant applied for unemployment benefits and was denied. Appellant appealed the denial of benefits, which was affirmed twice at the administrative level and again in the trial court. Appellant now appeals the trial court's judgment confirming the review commission's decision to deny his unemployment benefits. Appellant's single assignment of error, that the trial court erred in affirming the denial of benefits, is without merit and is overruled.

Factual and Procedural History

{¶2} Appellant, Ivan Maldonado, was employed by Appellee, Youngstown State University ("YSU"), from 1989 until his discharge on July 6, 2009. At the time of separation he was employed as a payroll specialist II and also served as the president of the Association of Classified Employees at YSU, which is the union representing approximately 400 of the university's eligible, non-supervisory, classified employees.

{¶3} In 2007 Appellant, then an administrative assistant, requested that his position and responsibilities be audited for reclassification as a level II administrative assistant. If the audit resulted in reclassification, Appellant would be awarded an increase in pay. Carol Trube was the internal auditor assigned to evaluate Appellant's position. Appellant contacted Ms. Trube prior to the deadline for completion of the audit and demanded that the audit of his position be completed within two weeks and that the increase in pay be approved. Appellant warned Ms. Trube that if she failed to reclassify him, it would make him very angry, and she "[would] not want to make him very angry." (11/9/09 Review Commission Hearing, p. 8.) He said he would begin by making a series of public records requests, but that the requests would only be the first step in a series of unpleasant actions. Ms. Trube

was so shaken by the incident that she reported it to her supervisor, who suggested that she report it to campus police. She asked for more time to consider whether to inform the police, but instead proceeded to write two memos, one to her supervisor and one to human resources, requesting that she be removed from Appellant's audit and that an outside firm be brought in to complete the process. Ms. Trube was not removed from the audit, completed it on time, and recommended approval of the reclassification. Appellant was verbally reprimanded for his conduct but, by agreement, no notice of the reprimand was included in his disciplinary file.

{¶4} In late 2008 or early 2009 Appellant, in his capacity as president of the union, negotiated a letter of agreement with YSU which allowed the outgoing union president to be hired to a university position without first advertising the position. This agreement was in violation of the terms of the collective bargaining agreement, and the parties to the letter of agreement apparently agreed to destroy their copies. Despite attempts to conceal the agreement, copies of which were required to be provided to YSU's governing board, the letter was released and was being circulated among the bargaining unit in early March of 2009. Appellant believed that Kay Helschel was responsible for circulating the letter, although another party would have had to release it to her. Appellant called Ms. Helschel, in the presence of the former president who had been hired as a result of the agreement, and told her that circulating the letter would be "bad for her health." (11/9/09 Review Commission Hearing, pp. 39-41.) Ms. Helschel reported the threat to campus police.

{¶5} On March 11, 2009, Charlene Yusko, a union member, telephoned Appellant to ask him about the letter of agreement that was being circulated. During the conversation, Appellant identified by name the people he believed were

responsible for releasing the letter and said he would "slice their fucking throats." (11/9/09 Review Commission Hearing, p. 21.) He then referred to two other employees, both women, as a "cunt bitch" and a "dried up old bitch." (11/9/09 Review Commission Hearing, p. 22.) It is unclear why these comments were made; the two women do not seem to be connected to any of the people Appellant blamed for releasing and circulating the letter of agreement. Ms. Yusko was shocked by Appellant's threat to slice the throats of those he blamed for the letter, and began to take notes of the conversation. She made a note of Appellant's threats and the profane statements as well as where she was told to direct a public records request to get the information surrounding the letter of agreement. Others working near her could hear Appellant shouting through the phone, but could not make out specific words and were told the contents of the conversation by Ms. Yusko when the call ended. Ms. Yusko also reported the statements to her supervisor and to those she met at lunch. When she returned to her desk after lunch she was instructed by her supervisor to give a statement as to what had happened to the campus police officers who were waiting for her in a nearby office.

{¶6} Appellant was placed on administrative leave on March 13, 2009. On July 8, 2009, Appellant filed an application for unemployment benefits with the Ohio Department of Job and Family Services ("ODJFS"). YSU responded to Appellant's application for benefits and explained that he had been discharged for making threatening, lewd and indecent statements, which were violations of board policy, the employee code of conduct and his union contract, in addition to errors in the performance of his duties. In support of its response YSU provided copies of Appellant's termination notices which incorporated a pre-disciplinary hearing report

signed by Eugene P. Grilli, YSU's vice president for finance and administration. YSU also submitted copies of a supplemental investigatory report, prepared at the request of Mr. Grilli, who acted as the hearing officer during Appellant's disciplinary hearing, and two memos from Carol Trube concerning the earlier incident of Appellant's misconduct.

**{¶7}** Appellant's initial application for unemployment benefits was denied on July 28, 2009. He appealed the decision on July 31, 2009. In support of his appeal, Appellant denied making profane statements and engaging in conduct "which constituted just cause for my termination." (7/31/09 Appeal Letter to ODJFS.) Appellant explained that he was the president of YSU's employee union and argued that his termination was due to his union activities and that YSU's progressive discipline policy was not followed in his case. He claimed to be the second consecutive union president YSU had attempted to terminate. ODJFS affirmed the original denial of benefits on August 24, 2009, stating that a review of the original facts and the additional information provided in the appeal did not support a change in the initial determination. Appellant appealed the redetermination and the matter was transferred to the Unemployment Compensation Review Commission ("review commission") on September 17, 2009. (The administrative review body was called "review board" until 1996 when H.B. 670, effective December 2, 1996 changed the entity to the "review commission" and the two are used interchangeably in opinions on unemployment compensation). Appellant requested and received an in-person rather than a telephonic hearing.

**{¶8}** The hearing was held on November 9, 2009. YSU presented testimony from Carol Trube and Charlene Yusko. YSU also entered Appellant's termination

letter, pre-disciplinary hearing report, the supplemental investigatory report, memos and responses to ODJFS and review commission questionnaires. YSU presented a copy of Ms. Yusko's personal notes taken during her conversation with Appellant on March 11, 2009. Appellant offered his own testimony as well as testimony and affidavits of various people who were either in the room or within earshot of the telephone calls in question, who stated generally that they had not heard Appellant make any of the offending statements, and probably would have been in a position to hear them had they been made. YSU also offered testimony concerning the allegations of non-performance of Appellant's duties, but the hearing officer concluded that the threats and profanity were given as the primary reason for termination and declined to hear evidence of dereliction of duty.

<u>Argument and Law</u>

<u>Assignment of Error</u>

THE TRIAL COURT ERRED WHEN IT AFFIRMED THE UNEMPLOYMENT COMPENSATION BOARD OF REVIEW ORDER DENYING APPELLANT'S APPLICATION FOR UNEMPLOYMENT BENEFITS.

**{¶9}** An appellate court applies the same standard of review as the commission when evaluating a review commission's determination denying unemployment benefits due to a termination for just cause. *Tzangas, Plakas & Mannos v. Ohio Bur. of Emp. Serv.*, 73 Ohio St.3d 694, 653 N.E.2d 1207 (1995), paragraph one of the syllabus. Ohio Revised Code section 4141.282(H) limits a court's review of the commission's decision as to whether the decision was "unlawful,

unreasonable, or against the manifest weight of the evidence." Upon a finding that the commission's decision is unlawful, unreasonable, or against the manifest weight of the evidence, the court "shall reverse, vacate, or modify the decision, or remand the matter to the commission." R.C. 4141.282(H).

{¶10} If the reviewing court does not find that the decision was unlawful, unreasonable, or against the manifest weight of the evidence, the court "shall affirm the decision of the commission." R.C. 4141.282(H). "Determination of purely factual questions is primarily within the province of the referee and the board. * * * [Appellate] courts are not permitted to make factual findings or to determine the credibility of witnesses." *Irvine v. Unemployment Comp. Bd. of Review*, 19 Ohio St.3d 15, 17-18, 482 N.E.2d 587 (1985) (this court, when following the standard for review and other holdings in *Irvine*, noted in *Struthers v. Morell*, 146 Ohio App.3d 709, 2005-Ohio-6594, 843 N.E.2d 1231, that unlike the burden of proof placed on the employee in *Irvine*, the *Morell* court was bound by R.C. 4141.281(C)(2) to ascribe no burden of proof in the proceeding). "The fact that reasonable minds might reach different conclusions is not a basis for the reversal of the board's decision" *Irvine* at 18. "Where the board might reasonably decide either way, the courts have no authority to upset the board's decision." *Id.* citing *Charles Livingston & Sons, Inc. v. Constance*, 115 Ohio App. 437, 438, 185 N.E.2d 655 (1961).

{¶11} The validity of the employer's decision to terminate Appellant is not before us for review. Our review is limited to determining whether the commission had sufficient evidence to support its decision that the employee was terminated for just cause. Benefits must be denied if it appears, based on the information that was provided to the commission as it appears in the record, that just cause for termination

existed. What constitutes "just cause" with regard to eligibility for unemployment benefits is separate and distinct from what may or may not be just cause for termination under the terms of an individual's contract, a company's internal policies, or other areas of employment law. A just cause determination for the purpose of unemployment benefits focuses the inquiry on the concept of fault. "The Act does not exist to protect employees from themselves, but to protect them from economic forces over which they have no control. When an employee is at fault, he is no longer the victim of fortune's whims, but is instead directly responsible for his own predicament. Fault on the employee's part separates him from the Act's intent and the Act's protection. Thus, fault is essential to the unique chemistry of a just cause termination." *Williams v. Ohio Dept. of Job and Family Servs.*, 129 Ohio St.3d 332, 336, 2011-Ohio-2897, 951 N.E.2d 1031, ¶22-23, citing *Tzangas, supra*, at 697-698. "Fault, however, is not limited to willful or heedless disregard of a duty or a violation of an employer's instructions" and includes a variety of behaviors such as unsuitability for the position. *Id.* at ¶24.

{¶12} Although it is not defined by statute, just cause is described by the Supreme Court as "that which, to an ordinarily intelligent person, is a justifiable reason for doing or not doing a particular act." *Irvine* at 17 quoting *Peyton v. Sun T.V. & Appliances*, 44 Ohio App.2d 10, 12, 335 N.E.2d 751 (1975). The determination as to whether there is just cause for discharge depends upon the factual circumstances of each case. *Warrensville Hts. v. Jennings*, 58 Ohio St.3d 206, 207, 569 N.E.2d 489 (1991). "[W]hat constitutes just cause must be analyzed in conjunction with the legislative purpose underlying the Unemployment Compensation Act. Essentially, the Act's purpose is 'to enable unfortunate employees, who become

and remain *involuntarily* unemployed by adverse business and industrial conditions, to subsist on a reasonably decent level and is in keeping with the humanitarian and enlightened concepts of this modern day.' (Emphasis sic.)" *Irvine* at 17, quoting *Leach v. Republic Steel Corp.*, 176 Ohio St. 221, 223, 199 N.E.2d 3 (1964).

{¶13} Appellant urges us to conduct a de novo review and to adopt his conclusions concerning the underlying facts because he alleges that the question of whether there was just cause for termination is one of law, not fact. (Appellant's Brf., p. 4.) This Court, however, has already determined that "[w]hat constitutes just cause for termination is a question of fact, and determination of purely factual questions is primarily within the province of the Board of Review." *Guy v. City of Steubenville*, 147 Ohio App.3d 142, 2002-Ohio-920, 768 N.E.2d 1243, ¶21 citing *Irvine* at 17. Our review of a commission's decision is therefore limited to determining "whether the board's decision is supported by evidence in the record." *Guy* at ¶24. We will not reverse a commission's decision simply because "reasonable minds might reach different conclusions," nor will we reverse if the decision is "supported by some evidence in the record." *Id.* at ¶21-22. In fact, "[w]here the board of review might reasonably decide either way, the courts have no authority to upset that decision." *Id.* at ¶22 citing *Irvine*, *supra*.

{¶14} Appellant divides the argument that there was no just cause for his termination into four parts: (1) his conversation with Carol Trube was not threatening and was not identified as a basis for termination; (2) his comment to Kay Helschel was not a threat and could not be perceived as a threat; (3) he never told Charlene Yusko he would slit anyone's throat, but even if he had, the statements were not actionable because they were not made directly to the individuals threatened and the

existence of a threat depends on the perception of the listener, who did not immediately perceive them as bona fide threats; and (4) Appellant never used lewd, indecent, or obscene language concerning other female employees, but if he had, the alleged statements do not establish just cause for termination. Appellant also argues generally that the only evidence that he received a verbal reprimand in 2007 is hearsay and cannot, under *Taylor v. Bd. of Review*, 20 Ohio App.3d 297, 485 N.E.2d 827 (1984), be given greater credibility than his own sworn testimony at the hearing. "[W]here the sworn testimony of a witness is contradicted only by hearsay evidence, to give credibility to the hearsay statement and to deny credibility to the claimant testifying in person is unreasonable. Thus, any weight to be given to the employer's hearsay is clearly outweighed by appellant's sworn testimony at the hearing before the referee." (Internal citations omitted.) *Id.* at 299. Appellant makes the same hearsay argument concerning the statements made to Ms. Helschel and Ms. Yusko, all of which he also denies making. He argues that his direct testimony and the affidavits of his supervisor and subordinates should be given greater weight than the testimony and documents provided by his employer. He concludes that the hearing officer gave inappropriate weight to the testimony and documentary evidence provided by his employer because the officer's stated basis for the determination suggests that he found the employer's evidence, which included hearsay, more credible than Appellant's.

{¶15} Proceedings at both the hearing officer and the review commission level are governed by R.C. 4141.281 which provides in pertinent part:

> In conducting hearings, all hearing officers shall control the conduct of
>
> the hearing, exclude irrelevant or cumulative evidence, and give weight

> to the kind of evidence on which reasonably prudent persons are accustomed to rely in the conduct of serious affairs. Hearing officers have an affirmative duty to question parties and witnesses in order to ascertain the relevant facts and to fully and fairly develop the record. Hearing officers are not bound by common law or statutory rules of evidence or by technical or formal rules of procedure.

R.C. 4141.281(C)(2). As the Ohio Supreme Court emphasized *Simon v. Lake Geauga Printing Co.*, 69 Ohio St.2d 41, 430 N.E.2d 468 (1982), the aim of the procedural provision "is to avoid the rigid formality imposed by technical rules of evidence, while constructing an efficient method for ascertaining a claimant's entitlement to unemployment compensation benefits * * * its meaning is apparent: the Board of Review and the referee need not apply stringent rules in determining the admissibility of evidence in the record." *Id.* at 43. The procedural provision then in force, R.C. 4141.28(J), provided "the board and the referees are not bound by common law or statutory rules of evidence or by technical or formal rules of procedure," which is substantively identical to the current version.

{¶16} According to the Court, if evidence is placed in the record by the review commission it must be weighed and considered by the commission when making a decision and recognized by the trial or appellate court reviewing the commission's decision. *Simon* at 43. The *Simon* Court concluded: "evidence which might constitute inadmissible hearsay where stringent rules of evidence are followed must be taken into account in proceedings [before a review board] where relaxed rules of evidence are applied;" it is the referee's function "as the trier of fact, to consider the evidence listed above, along with the credibility of the individuals giving testimony

before the board" in reaching a decision. *Id.* at 44. "A reviewing court can not usurp the function of the triers of fact by substituting its judgment for theirs. 'The decision of purely factual questions is primarily within the province of the referee and the board of review.' " *Id.* at 45, citing *Brown-Brockmeyer Co. v. Roach*, 148 Ohio St. 511, 518, 76 N.E.2d 79 (1947).

{¶17} Appellant contends that we should ignore the Ohio Supreme Court's description of the fact finding role of the review commission and instead rely on the more stringent prohibition against hearsay testimony utilized by the Eighth District in *Taylor*, *supra*. The *Taylor* Court held that direct testimony should always outweigh hearsay in review hearings. When comparing the conclusion reached by the Supreme Court in *Simon* to *Taylor,* courts in the Fourth, Fifth, Sixth, Ninth, Tenth, Eleventh, Twelfth and now even the Eighth, have found the *Taylor* rule too rigid for application or inappropriate under the facts. When distinguishing *Taylor*, many courts have found, like the Twelfth District in *Hansman v. Ohio Dept. of Job & Family Serv.*, 12th Dist. No. CA2003-09-224, 2004-Ohio-505, that the rule would destroy the factfinder's ability to function as the law intends:

> [R]igid application of a rule automatically crediting sworn testimony over hearsay evidence is inconsistent with the duty of the fact-finder to weigh and consider the evidence. The Ohio Supreme Court found that the logical corollary of allowing evidence in unemployment hearings that would be otherwise inadmissible is that such evidence must be weighed and considered, not only at the hearing itself, but also on appellate review. A rigid rule would remove this duty from the fact-finder. Furthermore * * * a fact-finder is not required to accept the testimony of

a witness simply because no contrary evidence is presented. (Internal citation omitted.)

*Id.* at ¶12. The *Hansman* court concluded: "we find no merit to appellant's argument that the hearing officer was automatically required to credit his testimony above any hearsay evidence. Furthermore, after examining the type of hearsay evidence at issue in this case, we find no error in the hearing officer's decision to give weight to such evidence." *Id.* at ¶13. The evidence at issue in *Hansman* included letters written by USF Holland to the appellant warning him that he violated company policy for absenteeism or tardiness. The *Hansman* court observed that the documents "appear to have been created as part of a company policy, and not in contemplation of appellant's request for unemployment benefits and we find nothing inherently unreliable in the letters themselves." *Id.* at 13. Similarly, the evidence at issue against Appellant includes two internal memos prepared by a witness who testified, a pre-disciplinary hearing report which appears to have been prepared pursuant to an internal or a union policy, and the letter terminating Appellant, which he requested in lieu of a verbal separation. This is exactly the type of evidence that a majority of Ohio Appellate districts and the Ohio Supreme Court find reasonable when used as a basis for a hearing officer's decision, even when contradicted by a party's direct testimony. We decline to adopt a rule that would negate a fact-finder's ability to make credibility determinations and do not find *Taylor* persuasive on this issue.

{¶18} Appellant also argues that Ms. Trube's hearsay testimony was the only evidence that he was disciplined in 2007 and that this hearsay should be negated by his direct testimony. He overlooks the fact that the hearing officer at his disciplinary hearing, Mr. Grilli, YSU's vice president for finance and administration, verified that

he, himself, gave Appellant a verbal reprimand for the Trube incident in the present pre-disciplinary report. Appellant's argument that his threatening behavior in 2007 was irrelevant to his termination because it is not mentioned in the termination letter is inaccurate. It was described in the pre-disciplinary report attached to and referenced in the termination letter. Appellant also overlooks the fact that, unlike the circumstances in *Taylor*, where a third-hand statement made by an individual identified only as George to an investigator from ODJFS was the sole basis for a finding that the claimant did not have a legitimate fear of physical violence at work, the hearing officer in this instance had a variety of evidence before him. In *Taylor* the hearing officer denied benefits on the strength of the investigator's memory of George's statement alone; no testimony or direct evidence of any kind was presented by the employer. In contrast, the hearing officer in this matter had the hearsay declarant, whose credibility he could judge, as well as the pre-disciplinary report, the memos, the termination letter, and the testimony of other witnesses to evaluate and weigh. The pre-disciplinary report appears to have been prepared in accordance with an internal policy or the collective bargaining agreement in preparation for a disciplinary hearing. Although it is hearsay in the strict sense, it may nevertheless be admissible under a hearsay exception and is certainly well within the flexible parameters of what a hearing officer may consider. The report appears to be "the kind of evidence on which reasonably prudent persons are accustomed to rely in the conduct of serious affairs," contemplated by R.C. 4141.281(C)(2). The *Taylor* rule does not prevent the hearing officer from relying on the documents provided by YSU or Ms. Trube's testimony. Both provide reasonable basis for the hearing officer's decision.

**{¶19}** Appellant directly testified that he told Ms. Helschel that circulating the letter of agreement would be bad for her health. He disputes the characterization of this statement as a threat and argues that there was no competent, credible evidence on which the hearing officer could rely to conclude that the statement was a threat. Appellant contends that his explanation of the statement as a warning concerning the effects of stress that would be brought on by the litigation that would ensue if circulation continued was the only accurate characterization to be made from this statement. Appellant overlooks the fact that it was well within the hearing officer's purview to find that the statement, which was not disputed, had been made and that Appellant's explanation was disingenuous. As the trier of fact, it is the referee's job to resolve conflicts in the evidence and to assess the credibility of a claimant's or a witness's testimony. See, *Irvine v. Unemployment Comp. Bd. of Review*, 19 Ohio St.3d 15, 482 N.E.2d 587 (1985). The hearing officer in this instance did precisely that, and this Court on review is not entitled to second guess the hearing officer's determination of fact or of witness credibility. *Id.* at 18.

**{¶20}** Neither Appellant's self-serving attempt to whitewash a statement that could be reasonably interpreted as a threat nor the testimony of his witness, who was the beneficiary of the secret agreement, prevail over evidence to the contrary. The testimony provided by Appellant and his witness was subject to a credibility determination by the trier of fact. The trier of fact also had before him evidence that Appellant had previously threatened a co-worker, and had been reprimanded for that threat, and evidence that both Appellant's employer and Ms. Herschel treated the statement to her as a threat. The fact that Appellant believes the review commission

should have weighed the testimony differently is not the type of unlawful or unreasonable determination necessary to reverse the commission's decision.

{¶21} With regard to the statements Appellant was alleged to have made during his conversation with Ms. Yusko, that he would "slit the f----g throats" of those he believed to be responsible for releasing the letter of agreement and referring to his co-workers in extremely crude, gender-specific, and derogatory terms, Appellant both denies making the statements and argues that even if he had made the statements they do not constitute just cause. In support of his argument that the statements do not rise to the level of just cause for termination, he cites one court case and two review commission decisions: *Thompson v. Aeroquip Inaoc Co.*, 6th Dist. No. S-02-022, 2003-Ohio-1859, *In re Claim of Barbara R. Harding*, Unemp. Comp. Bd. of Rev., No. 641760-BR, August 4, 1986, and *In re Claim of Mark A. Williams*, Unemp. Comp. Bd. of Rev., No. 92-03392-0000, March 26, 1993. The precedential effect of review commission decisions is limited by R.C. 4141.28(H) to "claimants similarly situated." And while we may find the decisions of other districts persuasive, we are in no way bound by them. None of the decisions identified by Appellant, however, present similarly situated claimants.

{¶22} In both *Thompson* and *In re Williams*, the threats made by the claimants were conditional and the outbursts were isolated instances. In *Thompson* the court found that the claimant's single, hyperbolic statement was provoked by another employee's long-standing and repeated interference with his ability to do his work coupled with the continued failure of management, who was aware of the problem, to take action. The threat the claimant made in that instance was expressly predicated on continued supervisory inaction and continued interference with his

work: if the supervisor didn't take action and if the other employee interfered with his work again, he would stab him with a screw driver. The board in *Thompson* determined that while the statement was certainly intemperate and threatening, it was an expression of the employee's frustration over a long-standing problem and an attempt to obtain a solution from his employer, rather than the type of misconduct that merits termination.

{¶23} In *Williams* an employee, who had been reprimanded for using his employer's phone to make 900-number calls and incurring charges, discovered that the cost of the calls had been deducted from his paycheck and angrily asked a receptionist if the company president was on the premises. Learning that the president was in close proximity, the claimant responded "I'm so mad that if I don't leave now, I'll shoot [him]." *Id.* at pp. 4-5. The claimant then voluntarily left. The review commission determined that there was no showing that a genuine threat had been made in *Williams*, and instead found the claimant's statement "merely expressed his anger over the situation and should not reasonably have been considered to be threatening in nature." *Id.* at p. 6.

{¶24} The situation in *In re Harding*, the second review decision Appellant relies on to support his claim, is somewhat similar to *Thompson*. The claimant in *Harding* had a long-standing antagonistic relationship with a co-worker, in which the review panel found both parties to be at fault. The claimant had a daily working relationship with the individual she was alleged to have threatened. Shortly before the claimant told her co-worker she would "blow (his) brains out," she reported a problem with water quality to their supervisor which the other employee then disputed. As the claimant proceeded to re-test water quality the other employee

bumped into her, prompting the statement. *Id.* at p. 5. The claimant was not armed at the time, did not own a gun, and took no action to carry out this single threat. The two completed their shift without further incident and the employee did not report the incident that day.

{¶25} On returning to work before his next shift, the employee reported the threat to their supervisor, specifically stating that he was not afraid of the claimant and did not believe she would carry out the threat, but that he was afraid of her adult son. Both individuals were called in to discuss the incident with the supervisor, which was unproductive, and both were discharged. At hearing, the factfinder learned that on previous occasions the other employee had telephoned the supervisor during their shared shifts to complain that the claimant had banged her hard hat and a clipboard too heavily on a desk and that she had left a door open while the air conditioning was on. The hearing officer found that the employee's failure to report what he later maintained amounted to a death threat, while he immediately reported incidents of hard hat and clipboard banging and leaving office doors open, indicated that the claimant's statement was, in fact, not taken as a threat and that at the time it was made it was understood to be an intemperate comment made in the heat of the moment.

{¶26} In each of the examples provided by Appellant, even where there was ongoing antagonism between employees, one single threat was identified as the basis for termination. None of the statements were recognized by the hearing officer, the review panel, or the court as bona fide threats. In contrast, Appellant's behavior here appears to reflect an escalating pattern of threatening, intimidating and verbally abusive behavior toward his female colleagues. YSU identifies four separate

instances of inappropriate behavior, the first of which establishes that Appellant knew, or should have known, that YSU would not tolerate threats against co-workers at the time he issued the later threats. The fact that YSU took the behavior seriously is reflected by the decision to place Appellant on leave and investigate the various claims.

**{¶27}** In an attempt to characterize his dismissal as an improper breach of policy, Appellant relies on *In re Claim of Stephanie L. Meinke*, Unemp. Comp. Bd. of Rev., No. C2007-267-0014, April 23, 2008, to discredit the documentary evidence provided by YSU. In *In re Meinke*, the owner of a day care had a policy that any employee would be terminated after three parental complaints. The discharge of Ms. Meinke was based on a father's phone call to the employer in which he said that his wife observed Meinke pick up one child by his arm and yelled in the face of a second child. As a result of these alleged incidents, the father told the day care owner that he would no longer be using her services. The employer then terminated Meinke via telephone, due to the complaints and the loss of a customer, that same day. After Meinke's termination, the day care owner obtained an affidavit from the caller's wife in which she stated that Meinke forced a pacifier into the mouth of one child, yelled at another child, shoved both, and roughly seated a different child in a high chair.

**{¶28}** On review, the hearing officer found Meinke's direct testimony that she had never mistreated a child in the seven years she worked at the day care more credible than the affidavit submitted by her former employer. No testimony was offered by the employer at the hearing. Although the stated reason for termination was the loss of a customer coupled with her two complaints, the employer apparently later stated that the termination was due to a violation of the three complaint rule

because there were three complaints in the affidavit. Unlike the situation in *In re Meinke*, where documents were produced after the fact that contained substantively different information and the employer changed her reason for termination, in the matter before us the documents and statements offered by YSU are the product of an actual investigation, discipline and hearing procedure. The documents are coupled with testimony from some of the individuals concerned. Additional testimony was also offered but declined by the hearing officer. Hence, unlike the record in *Meinke*, nothing in this record suggests that the evidence provided to the hearing officer was improperly or belatedly produced solely to support a predetermined decision to fire Appellant. Appellant's attempt to use *Meinke* to discredit YSU's documentary evidence is misplaced.

**{¶29}** In addition to his hearsay argument, Appellant asserts that threats are to be determined by the perception of the listener and that he could not be discharged for making a statement the listener did not perceive as a threat. He also states that his allegedly lewd, indecent or obscene remarks cannot establish just cause. Appellant cites *In re claim of Robert B. Basham*, Unemp. Comp. Bd. of Rev., No. B93-04349-000, November 15, 1994, and *Brown v. Sysco Food Serv. of Cincinnati, L.L.C.*, 4th Dist. No. 09CA2175, 2009-Ohio-5536 for his contention that the perception of the listener is determinative as to whether a statement is a threat. Again, Appellant's reliance is misplaced. The quote Appellant cites from *In re Basham* for the principle that the listener determines whether a statement is a threat actually refers to the "well settled" principle that "misguided jokes, horse-play, or other disruptive or harmful attempts at levity may be the basis for disciplinary action," and even where "the teller of such jokes need not intend them to be taken seriously,

it is the perception of the person hearing such statements that determines if the statement is actionable." *Id.* at p. 6. The reverse is not necessarily true. In a variety of other cases, hearing officers, review commissions, and courts have found statements were not threats, despite the stated perception of the listener. See, e.g. *Thompson v. Aeroquip Inaoc Co.*, 6th Dist. No. S-02-022, 2003-Ohio-1859, *In re Claim of Barbara R. Harding*, Unemp. Comp. Bd. of Rev., No. 641760-BR, August 4, 1986, and *In re Claim of Mark A. Williams*, Unemp. Comp. Bd. of Rev., No. 92-03392-0000, March 26, 1993.

{¶30} The *Basham* case cited by Appellant involved a newspaper article about workplace shootings that had "jokingly" been altered to indicate that vending machine related frustration resulted in workplace shootings. The altered document was posted on a workplace vending machine. When the machine attendant saw the article, he initially laughed and asked workers nearby if it was a joke, and Basham initially denied responsibility. After a brief conversation, Basham, who had altered and posted the article, removed it and placed it in the trash. Although the machine attendant initially joked about the article, he later retrieved it from the trash and reported the incident to his supervisor. Unknown to the attendant, Basham had made separate statements and had separate interactions with the supervisor about his frustration with vending machine pricing. Those statements and actions provided a backdrop that made the article appear to be a threat to the supervisor. Basham was discharged due to the incident and his subsequent appeal of the denial of his unemployment benefits was denied. Although the attendant had initially taken the posting as a (bad) joke, it was actually the more-informed concerns of the supervisor that drove the termination. In this instance, the "perception of the person hearing

such statements" extended to the perception of the supervisor receiving information about the statement after the fact and placing it in the context of prior statements.

**{¶31}** Similarly, when Appellant told Ms. Yusko he would slit the throats of those he believed responsible for releasing the letter of agreement she did not perceive a threat to herself, and did not know the people he named particularly well. She was nevertheless shocked and unsettled by the statements and later reported them. When her supervisor heard them, he immediately perceived them as a threat, called campus police, and told Ms. Yusko to report what Appellant had said to the officers who responded. When those statements are placed in the context of Appellant's other behavior, including the fact that Appellant, in his capacity as the president of the bargaining unit, may have made a deal that violated the terms of the collective bargaining agreement to secure a position for a former president and was facing a union no-confidence vote and the individuals against whom he made threats were those he believed responsible for releasing damaging information, it is clear how Ms. Yusko's supervisor, YSU, and the hearing officer could have concluded the statements were, in fact, threats. The record also reflects that this remark was not the first time Appellant had made threatening statements to a co-worker. What the decision in *Basham,* as well as other threat-related terminations reveal, is that the perception of the person who hears the statement at the time it is made is only one factor for the hearing officer to consider. In addition, he may consider how the statement is perceived by others and the context in which the statement is made when determining whether the statement amounts to just cause. Determinations are heavily fact-driven and there is nothing to suggest in this instance that the conclusion

reached by the review commission was unlawful, unreasonable, or against the manifest weight of the evidence.

**{¶32}** Finally, although Appellant tries to describe his obscene or lewd references to two other female employees as the type of unfortunate but incidentally profane expressions of frustration generally tolerated in the modern workplace, the intense, gender-specific and derogatory nature of the comments as well as the fact that they were apparently unrelated to the subject matter of the conversation suggests otherwise. Both the review commission and YSU argue that language this severe and fundamentally inappropriate is the type of language that "can be so disruptive and provocative that the employer's ability to maintain a productive environment is severely compromised." The hearing officer agreed. *Opara v. Carngie Textile Co.*, 26 Ohio App.3d 103, 106, 498 N.E.2d 485 (1985). YSU identifies an escalating pattern of threats, intimidation, and profane language that suggests Appellant was unable to interact appropriately with women who disagreed with or opposed him. The university argues that the type of language Appellant used revealed his "fundamental prejudices which jeopardize[d] continuing work relationships." Due to these behaviors, YSU terminated Appellant. *Id.* at 106. The hearing officer found this determination was reasonable. "If an employer has been reasonable in finding fault on behalf of an employee, then the employer may terminate the employee with just cause." *Tzangas, supra,* at 698.

**{¶33}** Appellant argues that his case is unlike *Opara*, which involved extremely inflammatory anti-Semitic comments, and that the hearing officer should instead have applied the four factors suggested in *Lombardo v. Ohio Bur. of Emp. Serv.*, 119 Ohio App.3d 217, 695 N.E.2d 11 (1997). Each unemployment

determination is fact driven. Hearing officers are not constrained to follow the suggestions of a court when making their determinations. Rather, they are charged by statute to give full and fair consideration to the information in the record. While the hearing officer was not required to apply the factors suggested in *Lombardo*, it is not clear from this record that it would have altered the outcome. In fact, the *Lombardo* court specifically noted that there is a large body of decisions finding the use of profanity to amount to just cause for termination, but that *Lombardo's* situation was unique because a single instance of the use of profanity was the sole cause of his discharge. *Id.* at 222. The *Lombardo* court derived and applied four principles from two other cases as the basis for its decision: the language in question was not directed at a person and was of no more intensity than language used by the claimant and the manager in non-work related conversations; that there was no evidence or finding that the words used by the claimant were part of a pattern; that only one other person was present; and that the outburst, according to the lower court, was an understandable reaction to an earlier occurrence. The claimant in *Lombardo* had requested that his shift be moved up two hours to accommodate a civil court hearing. He was told that the request would not be approved and that if he left early it would be considered as an infraction and he would lose his attendance bonus for the month. In front of his direct supervisor and the plant manager, who had denied the request, the claimant said "that's bullshit, * * * that's fucking bullshit" and walked out of the office and returned to work. *Id.* at 219. He was then instructed to return to the office, was given a five-day suspension by the manager, but subsequently terminated. Under these circumstances, applying the four factors, the *Lombardo* court concluded the outburst was not just cause for termination.

**{¶34}** In the instant matter the language was unprovoked, specifically directed at two other employees, was fairly intense or extreme, and appeared to be part of a pattern of inappropriate behavior. The fact that the comment was initially made to one person is not dispositive, it is merely a factor to consider. Appellant's profane statements were not the sole cause of termination but one of several incidents. "None of the reviewing courts can reverse a commission decision as being against the manifest weight of the evidence when there is some evidence in the record to support the commission's decision." *Struthers v. Morell*, 164 Ohio App.3d 709, 715, 843 N.E.2d 1231 (2005). The evidence reflected in this record supports the hearing officer's conclusion that YSU had just cause to terminate Appellant and accordingly the denial of unemployment benefits is affirmed.

Conclusion

**{¶35}** The trial court did not err in affirming the Unemployment Compensation Board of Commission order denying Appellant's application for unemployment benefits. The review commission's decision is supported by the evidence in the record and is not unreasonable or unlawful. Appellant's sole assignment of error is overruled and the judgment of the trial court is affirmed.

Rice, J., concurs.

Trapp, J., concurs.